Jerry Lane JUREK, Appellant,

v.

The STATE of Texas, Appellee.

No. 49416.

Court of Criminal Appeals of Texas.

April 16, 1975.

Rehearing Denied May 7, 1975.

George I. Middaugh & Emmett T. Summers, III, Cuero, for appellant.

Wiley L. Cheatham, Dist. Atty., Cuero, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

MORRISON, Judge.

The offense is murder; the punishment, under Article 1257, Vernon's Ann.P.C.[1]

1. As amended, Acts 1973, 63rd Leg., p. 1122, ch. 426, Article 1, Sec. 1, eff. June 14, 1973. August 16, 1973. This is the first case to of the new Texas Penal Code, Acts 1973, 63rd Leg., ch. 399, eff. January 1, 1974. Section 19.03 of the new Penal Code is substantially

and Article 37.071, Vernon's Ann.C.C.P.,[2] death.

The offense occurred in Cuero. The record reflects that after spending the late afternoon drinking beer, the 22 year old appellant made repeated efforts to engage 10 year old Wendy Adams in conversation at the Cuero City Park. They were next seen as appellant sped through town in his pickup, the child in back screaming for help. The pickup halted near Hell's Gate Bridge, which spans the Guadalupe River at the outskirts of Cuero, where appellant attempted to make sexual advances to the child. Rebuffed, he began to choke the girl. When she lost consciousness, he threw her into the river. The child's body was recovered from the river two days later.

We are met at the outset with appellant's contention that the assessment of the death penalty under Article 1257, supra, and Article 37.071, supra, is cruel and unusual punishment under the holding of the Supreme Court of the United States in Furman v. Georgia, 408 U.S. 238, 92 S.Ct.

2726, 32 L.Ed.2d 346, (1972), and the Eighth and Fourteenth Amendments of the United States Constitution.

*Furman* is lengthy and complex. There are nine separate opinions. Five Justices comprise the majority; four Justices dissenting. Of the five Justices who joined in the majority, no two concurred for the same reason. Such diversity makes generalization difficult. However, some conclusions may be drawn.

Two Justices in the majority concluded that the death penalty is cruel and unusual punishment under the Eighth Amendment.[3] Three other Justices, who concurred in the majority, did not conclude the death penalty was unconstitutional per se. Rather, they condemned as they see it, the arbitrary, capricious and standardless manner in which juries impose the death penalty. They rejected the concept of uncontrolled discretion in the jury to impose the death penalty or some lesser penalty.[4]

*Furman,* then does not seem to ban the assessment of the death penalty per se or to eliminate all sentencing discretion. It

similar to Article 1257 of the old code. The indictment alleged the date of the offense as August 16, 1973. This is the first case to reach this Court under either statute.

2. Added by Acts 1973, 63rd Leg., p. 1125, ch. 426, Art. 3, Sec. 1, eff. June 14, 1973.

3. Justice Brennan concluded:
"Death is an unusually severe and degrading punishment; there is a strong probability that it is inflicted arbitrarily; its rejection by contemporary society is virtually total; and there is no reason to believe that it serves any penal purpose more effectively than the less severe punishment of imprisonment. The function of [an analysis of] these principles is to enable a court to determine whether a punishment comports with human dignity. Death, quite simply, does not."
Justice Marshall stated:
". . . capital punishment violates the 8th Amendment because it is morally unacceptable to the people of the United States at this time in their history."

4. Justice Douglas wrote:
"Rather, we deal with a system of law and of justice that leaves to the uncontrolled

discretion of judges or juries the determination whether defendants committing these crimes should die or be imprisoned. Under these laws no standards govern the selection of the penalty. People live or die, dependent on the whim of one man or twelve."
Justice Stewart said:
"I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and freakishly imposed."
Justice White concluded:
"In this respect, I add only that past and present legislative judgment with respect to the death penalty loses much of its force when viewed in light of the recurring practice of delegating sentencing authority to the jury and the fact that a jury, in its own discretion and without violating its trust or any statutory policy, may refuse to impose the death penalty no matter what the circumstances of the crime. Legislative 'policy' is thus necessarily defined not by what is legislatively authorized, but by what juries and judges do in exercising the discretion so regularly conferred upon them. In my judgment what was done in these cases violated the Eighth Amendment."

seems reasonable to conclude that there are seven Justices—the four dissenters and these latter three members of the majority—who would permit the imposition of the death penalty, if the statutes under which it was imposed were properly drawn.

Article 1257, supra, and Article 37.071, supra, were enacted in response to *Furman.* The question before us is whether these statutes are valid under that holding. Do they provide effective guidance to the jury? Do they adequately limit the discretion of the jury? Do they guard against the arbitrary and standardless imposition of the death penalty?

We hold they do.

Article 1257, supra, states:

"(a) Except as provided in Subsection (b) of this Article, the punishment for murder shall be confinement in the penitentiary for life or for any term of years not less than two.

(b) The punishment for murder with malice aforethought shall be death or imprisonment for life if:

(1) the person murdered a peace officer or fireman who was acting in the lawful discharge of an official duty and who the defendant knew was a peace officer or fireman;

(2) the person intentionally committed the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, forcible rape, or arson;

(3) the person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration;

(4) the person committed the murder while escaping or attempting to escape from a penal institution;

(5) the person, while incarcerated in a penal institution, murdered another who was employed in the operation of the penal institution.

(c) If the jury does not find beyond a reasonable doubt that the murder was committed under one of the circumstances or conditions enumerated in Subsection (b) of this Article, the defendant may be convicted of murder, with or without malice, under Subsection (a) of this Article or of any other lesser included offense.

(d) If one of the circumstances or conditions enumerated in Subsection (b) of this Article is charged in an indictment, the prospective jurors shall be informed that a sentence of either death or imprisonment for life is mandatory on conviction for the offense charged. No person is qualified to serve as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

Article 37.071, supra, states:

"(a) Upon a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment. The proceeding shall be conducted in the trial court before the trial jury as soon as practicable. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence. This subsection may not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas. The state and the defendant or his counsel shall be permitted to present argument for or against the sentence of death.

(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately

and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

(c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue submitted.

(d) The court shall charge the jury that:

(1) it may not answer any issue 'yes' unless it agrees unanimously; and

(2) it may not answer any issue 'no' unless 10 or more jurors agree.

(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life.

(f) The judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals within 60 days after certification by the sentencing court of the entire record unless time is extended an additional period not to exceed 30 days by the Court of Criminal Appeals for good cause shown. Such review by the Court of Criminal Appeals shall have priority over all other cases, and shall be heard in accordance with rules promulgated by the Court of Criminal Appeals."

First, Article 1257, supra, limits the circumstances under which the State may seek the death penalty to a small group of narrowly defined and particularly brutal offenses. This insures that the death penalty will only be imposed for the most serious crimes. It also insures that the death penalty will only be imposed for the same type of offenses which occur under the same types of circumstances.

Article 37.071, supra, further limits the standardless imposition of the death penalty. It provides for a separate sentencing procedure to determine punishment, once the accused has been found guilty of a most serious crime. It limits the jury's discretion on the range of punishment to life imprisonment or death. A jury may no longer choose from a range of two years to life to death. Further, in order to impose the death penalty, the jury must find beyond a reasonable doubt and must respond affirmatively to two or three questions, depending on the circumstances. These questions direct and guide their deliberations. They channel the jury's consideration on punishment and effectively insure against the arbitrary and wanton imposition of the death penalty.

Lastly, the statute provides for swift and mandatory appellate review.

■ We reject appellant's contention that Article 37.071(b), supra, is too vague to provide adequate guidance to the jury. The fact that an exhaustive and precise list of factors is not specifically included does not indicate that the jury is without adequate guidelines. We are inclined to believe that the factors which determine whether the sentence of death is an appropriate penalty in a particular case are too complex to be compressed within the limits of a simple formula[5] However, there are some factors which are readily apparent and are viable factors for the jury's consideration. In determining the likelihood that the defendant would be a continuing

5. Report of Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, para. 498, p. 174 (1953).

threat to society, the jury could consider whether the defendant had a significant criminal record. It could consider the range and severity of his prior criminal conduct. It could further look to the age of the defendant and whether or not at the time of the commission of the offense he was acting under duress or under the domination of another. It could also consider whether the defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity, but more than the emotions of the average man, however inflamed, could withstand.

Looking to other jurisdictions with post-Furman death penalty statutes, we find that the Supreme Courts of Florida [6] and Georgia [7] have upheld statutes with non-mandatory death penalty provisions based on the theory that the statutes adequately provide control of the jury's discretion and safeguards against the arbitrary impositions of the death penalty.[8]

Some discretion is inherent and desirable in any system of justice, from arrest to final judgment. See *Dixon* and *Coley*. The mere presence of discretion in the sentencing process does not render that procedure violative of *Furman*. It is rather the quality of discretion and the manner in which it is applied that must be con-

trolled. To eliminate all discretion on the part of the jury would be to risk elimination of that valuable element which permits individualization based on consideration of all extenuating circumstances and would eliminate the element of mercy, one of the fundamental traditions of our system of criminal jurisprudence.[9] If discretion in the assessment of punishment under a statute can be shown to be reasonable and controlled, rather than capricious and discriminatory, the test of *Furman* will be met.

After considerable reflection, we find that the statutes with which we are confronted today do meet this test.

Appellant next charges the court erred in failing to grant his motion to quash the indictment. Appellant argues that the indictment is duplicitous. He contends that each count of the indictment charges him with four separate and distinct offenses, murder, attempted kidnapping, kidnapping, and forcible rape, in violation of Article 21.24, V.A.C.C.P.[10] and Article 1, Section 10 of the Texas Constitution, Vernon's Ann.St.[11]

The indictment [12] contains four counts. Count one, omitting the formal parts alleges:

"Jerry Lane Jurek . . . unlawfully, voluntarily, intentionally, and with mal-

6. State v. Dixon, 283 So.2d 1 (Florida 1973).

7. Coley v. State, 231 Ga. 829, 204 S.E.2d 612 (1974).

8. Three other state courts of last resort have also passed on the question of the death penalty in the post-Furman era. Those statutes, however, were held to be mandatory ones, and therefore not helpful to our consideration. See Jefferson v. Commonwealth, 204 S.E.2d 258 (Virginia 1974); State v. Jarrett, 284 N.C. 625, 202 S.E.2d 721 (1974); State v. Dickerson, 298 A.2d 761 (Delaware 1972). For other post-Furman decisions, see Winkle v. State, 528 P.2d 467 (Utah 1975) and Commonwealth v. Harrington, 323 N.E.2d 895 (16 Cr.L. 2506) (Mass.1975).

9. Discretion and the Constitutionality of the New Death Penalty Statutes, 87 Harv.Law Rev. 1690 (1974). The author is impressed with the logic presented in this commentary.

See also Is the Death Penalty Dead?, 26 Baylor Law Rev. 114 (1974).

10. Article 21.24 provides: "An indictment, information or complaint may contain as many counts charging the same offense as the attorney who prepares it, acting in good faith, may think necessary to insert, but may not charge more than one offense."

11. Texas Const. Art. I, Section 10 (1918) states that: "He [the accused] shall have the right to demand the nature and cause of the accusation against him, and to have a copy thereof."

12. For suggested forms under the New Texas Penal Code, see Morrison and Blackwell, New Penal Code Forms, sec. 19.03B, pp. 8–9 and Branch's Annotated Penal Code, Interim Pamphlet With Forms and Analyses, sec. 19.03, pp. 109–110.

ice aforethought killed Wendy Adams by choking and strangling her with his hands, and by drowning her in the water, by throwing her into a river, and that said Jerry Lane Jurek, was then and there in the course of committing and attempting to commit kidnapping of and forcible rape upon the said Wendy Adams . . . ."

■ The other three counts of the indictment charge the same acts in more detail and with slight variations. An indictment may contain as many counts charging the same transaction as the drafter deems necessary to meet variations in the proof. Ex parte Easley, Tex.Cr.App., 490 S.W.2d 570.

Article 1256, V.A.P.C., defines murder. Article 1257(a) and (b), V.A.P.C., prescribes the punishment for that offense. The portions of that statute, pertinent to this discussion, are:

"(a) Except as provided in Subsection (b) of this Article, the punishment for murder shall be confinement in the penitentiary for life or for any term of years not less than two.

(b) The punishment for murder with malice aforethought shall be death or imprisonment for life if:

(1) . . .

(2) the person intentionally committed the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, forcible rape or arson . . . ."

■ Capital murder, murder punishable under Article 1257(b) supra, occurs when the offense is committed under one of the circumstances set forth in that subsection. If one of these elements is not present, punishment for the offense falls under 1257(a). It is therefore essential, in order to fully apprise the accused of the charge against him, that an indictment for capital murder allege one of the conditions in Article 1257(b), supra.

■ Further, the fact that each count of the indictment includes the presence of more than one of the aggravating conditions set forth in Article 1257(b)(2), does not render the indictment duplicitous either. Where several ways an offense may be committed are set forth in a statute and are embraced in the same definition, are punishable in the same manner, and are not repugnant to each other, they are not distinct offenses, and may be charged in one indictment. Nicholas v. State, 23 Tex.App. 317, 5 S.W. 239; Ferguson v. State, 80 Tex.Cr.R. 383, 189 S.W. 271; Todd v. State, 89 Tex.Cr.R. 99, 229 S.W. 515. Attempted kidnapping, kidnapping and forcible rape are not repugnant to each other.

In Floyd v. State, 164 Tex.Cr.R. 50, 296 S.W.2d 523, we quote McArthur v. State, 132 Tex.Cr.R. 447, 105 S.W.2d 227, in which we concluded:

"The rule seems well settled that, if but one transaction is involved, and the offense be one which may have been committed in any one of several ways, the pleader may charge in the indictment in one count that such offense had been committed by doing this, and that, and the other, and there will be no duplicity . . . ."

The indictment is not duplicitous.

Appellant's remaining grounds of error challenge the admissibility of his confession. Initially, he questions the legality of his arrest and charges the court erred in admitting any statements made as the result of his illegal arrest.

■ However, it is not necessary to pass on the legality of the arrest. "A confession, otherwise shown to have been voluntary is not rendered inadmissible by the fact that its author was under arrest or in custody at the time, even though the arrest may have been under invalid process or without any process or legal right." Simmons v. State, Tex.Cr.App., 504 S.W. 2d 465; Morgan v. State, Tex.Cr.App., 502

S.W.2d 722; Lacefield v. State, Tex.Cr. App., 412 S.W.2d 906.

Nevertheless, the record reflects that the authorities had ample evidence to detain, question and arrest appellant. On the afternoon of the homicide, witnesses saw appellant, in his patchwork and haphazardly painted pickup, talking with the deceased in the Cuero City Park, where she had gone swimming. Shortly thereafter witnesses saw her riding in the back of this unusually colored pickup, screaming for help, as it sped through town. A relative soon reported her missing, and the search for her ensued. That evening, one of the witnesses who had seen this particular pickup at the park, identified it as the truck parked at appellant's residence. Appellant was therefore a logical person to question about the missing child's whereabouts.

The evidence further shows that the officers who arrested appellant were aware of an outstanding warrant for appellant's arrest in New Braunfels, which they verified soon after his arrest.

Next appellant claims that the State's failure to take him before a magistrate immediately after his arrest affects the validity of his confession. Appellant does not contend that he was not warned under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. He claims that the mere fact that he was not immediately taken before a magistrate vitiates the validity of his confession.

Failure to take an accused immediately before a magistrate does not vitiate a confession properly obtained prior thereto. Webb v. State, 415 F.2d 443, cert. den., 396 U.S. 1019, 90 S.Ct. 587, 24 L.Ed. 2d 511. Unreasonable delay in bringing an accused before a magistrate only renders the confession inadmissible upon a showing of some causal connection between the delay and the making of the confession. Simmons v. State, supra; Lester v. State, Tex.Cr.App., 490 S.W.2d 573; Creswell v.

State, Tex.Cr.App., 387 S.W.2d 887; Smith v. State, 171 Tex.Cr.R. 313, 350 S. W.2d 344, cert. den., 366 U.S. 883, 82 S.Ct. 126, 7 L.Ed.2d 83. There is no showing that the detention contributed to the making of appellant's two confessions.

Lastly, appellant claims his confessions were involuntary. He argues the record fails to show he "voluntarily, knowingly and intelligently" waived his constitutional rights. Appellant cites his limited mental capacity and the length and conduct of the interrogation which led to the confessions as factors which indicate the confessions were involuntary.

Appellant was arrested at 1:15 a. m. on August 17, approximately six hours after the child's disappearance. At police headquarters, the two arresting officers read appellant his *Miranda* warnings, and questioned him for approximately 45 minutes. He denied any knowledge concerning the child's whereabouts. At 2:30 a. m., he was placed in a jail cell, which contained a bed, and was left alone until the next morning, when the county attorney, who also read appellant his *Miranda* warnings, questioned him for approximately 15 minutes. He continued to deny any knowledge about the child's whereabouts. Two or three other officers spoke with him briefly during the morning.

Later in the day, two officers took appellant to Austin for a polygraph test. During the examination, he admitted murdering the girl. Her body was later recovered on the basis of information supplied by appellant at this time. The officers arrived back at Cuero with appellant at approximately 9:30 a. m. He was immediately taken before Magistrate Albert Ley, who read appellant his rights from a magistrate's certificate. Approximately four hours later, after being questioned by the district attorney and the county attorney, appellant gave his first confession. The confession stated that he killed the child because she made derogatory comments about his family. He was taken to

the County Jail at Victoria at about 1:15 a. m.[13] He was returned to Cuero at 2:00 p. m. and gave his second confession at 7:30 that evening after again speaking with the district attorney and the county attorney and several others. In the confession he stated that he had not told the complete truth in his earlier statement and that he killed the girl because she refused his sexual advances.

The record reflects that appellant was repeatedly warned of his constitutional rights under *Miranda*. There is no evidence in the record that appellant was deprived of food or sleep, or that he was not in complete control of his faculties when he gave the confessions. He was left alone in his cells between interrogations and was offered food and beverages at various times during this two day period. There is evidence that he was alert enough to make minor corrections in the confessions before signing them.

The court conducted a separate hearing on the motion to suppress the two written confessions. Appellant did not testify either at the hearing on the motion to suppress or at the trial on the merits. The court entered an order finding that the confessions were voluntarily given. Furthermore, the court submitted the question of the voluntariness of the confessions to the jury in its charge.

Absent undisputed evidence which would render the confession inadmissible as a matter of law, the Court will not reverse the findings of the trial judge and jury as to the voluntariness of the confession. Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166; Jacks v. State, 167 Tex.Cr.R. 1, 317 S.W.2d 731; Scanlin v. State, 165 Tex.Cr.R. 183, 305 S.W.2d 357; McHenry v. State, 163 Tex.Cr.R. 436, 293 S.W.2d 773.

The record amply supports the finding of the court and the jury adversely to appellant. Compare Kendrick v. State, Tex. Cr.App., 481 S.W.2d 877; Grayson v. State, Tex.Cr.App., 438 S.W.2d 553.

Finding no reversible error, the judgment is affirmed.

ONION, P. J., concurs in the results.

ODOM, J., concurs in part and dissents in part.

ROBERTS, J., dissents.

ODOM, Judge (concurring in part and dissenting in part).

At the outset I wish to state that I concur in the opinion of the majority that the death penalty is not unconstitutional. This Court has held and today continues to hold that the death penalty is a constitutionally permissible punishment. Tezeno v. State, Tex.Cr.App., 484 S.W.2d 374, 377; Williams v. State, Tex.Cr.App., 427 S.W.2d 868. The only point upon which I take issue with the majority is their interpretation of Article 37.071, V.A.C.C.P. The point at which I must part company with the majority is not on the constitutionality of the death penalty, but on the effect and meaning of the statute before us.

The majority interpret Article 37.071, V.A.C.C.P., as limiting the jury's "discretion on the range of punishment to life imprisonment or death," saying that the "two or three questions" asked by Art. 37.071 "direct and guide their [the jury's] deliberation," channeling "the jury's consideration on punishment." Article 37.071 prescribes a very distinct and rigid method for determining whether the punishment shall be death or life imprisonment.

"Art. 37.071. Procedure in Capital Case

13. County officials suggested and appellant agreed that he be taken to Victoria, the county adjoining the one in which the offense occurred. The record reflects the deceased child's father was a Cuero police officer whose work took him in and out of the Cuero jail frequently.

"(a) Upon a finding that the defendant is guilty of a capital offense, the court *shall* conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment. . . .

"(b) On conclusion of the presentation of the evidence, the court *shall* submit the following issues to the jury: . . .

"(c) . . . the jury *shall* return a special verdict of 'yes' or 'no' on each issue submitted.

" . . .

"(e) If the jury returns an affirmative finding on each issue submitted under this article, the court *shall* sentence the defendant to death. If the jury returns a negative finding on any issue submitted under this article, the court *shall* sentence the defendant to confinement in the Texas Department of Corrections for life." (Emphasis supplied.)

Where is the "discretion" referred to in the majority opinion? Each pertinent portion of Art. 37.071 uses "shall", the command form, rather than the permissive "may." The jury is required to answer special issues. These questions each require a factual determination by the jury. If the fact questions are answered in the affirmative, pronouncement of a sentence calling for the ultimate penalty is absolutely mandated by Art. 37.071. The word "shall" in Art. 37.071 inflexibly requires certain procedures to be followed, allowing no discretion in determining the punishment to be received by a defendant who is guilty of capital murder.

Before a person may serve as a juror, he must state under oath that the mandatory penalty of death or life imprisonment will not affect his deliberations on any issue of fact. Art. 1257(d), V.A.P.C. In order to grant "mercy"[1] in a particular case, the jurors must ignore their oaths and return a deliberately falsified answer to one of the fact issues in Art. 37.071(b). Unless this Court is to presume that jurors will ignore their oaths and return perjured answers to one or more of the issues, a complete prevarication, solely to arrive at the result they may feel is proper in a given case, we must hold this statute is mandatory, leaving no discretion to the jury in the matter of assessing punishment.

The death penalty is mandatory upon affirmative answers to fact questions, which must be decided free from any consideration of the resulting penalty. The statute is mandatory, not discretionary, as asserted by the majority.

In discussing the contention that Article 37.071(b) is too vague, the majority assert that "the factors which determine whether the sentence of death is an appropriate penalty in a particular case are *too complex to be compressed within the limits of a simple formula*." (Emphasis supplied.) Do not the majority, by this statement, recognize the inherent vagueness of Art. 37.071(b)? Somehow the majority seem to equate vagueness with discretion. The majority admit that Art. 37.071(b) does not contain an exhaustive and precise list of factors, but appear to reason that since all factors which determine whether the death sentence is appropriate in a particular case are too complex to be listed, a vague statute becomes "discretionary", and that some discretion is "inherent and desirable." The fact that discretion is "inherent and desirable" does not render a vague statute any less vague. The majority have erred in mistaking the vagueness of this mandatory statute for discretion.

Having mistaken vagueness for discretion, the majority naturally have failed to recognize the vagueness inherent in Art. 37.071(b)(2). The word "probability" is not examined by the majority. This concept is at the core of the issue submitted

---

1. "Mercy" is described by the majority as "one of the fundamental traditions of our system of criminal jurisprudence."

under this subsection, yet the majority seek neither to define it nor to discuss its meaning. The essential indefiniteness of the word "probability" is ignored.

One of the necessary conditions upon which assessment of death under Article 37.071, supra, must rest is a jury finding beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071(b)(2), supra.

This provision basing the imposition of capital punishment upon the probability of future events appears to be unique to this State. A survey of the capital punishment statutes of other states fails to reveal any provision similar to the "probability" issue of Article 37.071. In all the statutes reviewed, the aggravating circumstances, upon which imposition of the death penalty rests, concern either *prior* acts of criminal conduct or the means or circumstances surrounding the commission of the offense for which the accused is on trial.[2]

What did the Legislature mean when it provided that a man's life or death shall rest upon whether there exists a "probability" that he will perform certain acts in the future? Did it mean, as the words read, is there *a* probability, some probability, any probability? We may say there is a twenty percent probability that it will rain tomorrow, or a ten or five percent probability. Though this be a small probability, yet it is some probability, *a* probability, and no one would say it is no probability or not a probability. It has been written: "It is probable that many things will happen contrary to probability,"[3] and "A thousand probabilities do not make one fact."[4] The statute does not require a particular degree of probability but only directs that *some* probability need be found. The absence of a specification as to what degree of probability[5] is required is itself a vagueness inherent in the term as used in this issue. Our common sense understanding of the term leaves the statute too vague to pass constitutional muster.

In a recent text on statistics,[6] probability is defined as follows:

"The probability of an event may be defined as the number of *favorable* events divided by the number of *possible* events. Suppose we roll one die, which has six sides, along the floor and observe which face ends up on top. If the die is perfectly balanced, all faces (1 to 6) have an equal chance of appearing. Thus the total possible events would equal 6. If we were interested in a specific face, say 2 (and only 2), then the number of favorable events would be 1. Thus the probability of rolling a 2 would be equal to 1 divided by 6 or ⅙ or 16.67 percent or .17. If there were ten possible events and three favorable events, the probability would be 3⁄10 or .30. If all possible events are 'favorable', as they would be if you asked the chances of rolling some number from 1 to 6 with a die, the probability would then be 1.00. On the other hand, if there would be no favorable events, as there would be if you asked the chances of rolling a 22 with a single roll of the die, then probability would equal .00. It should be obvious that the probability of an event

2. See, e.g., the statutes of California, Cal. Penal Code Sec. 190.2; Colorado, CRS 39–11–103(6); Ohio, Ohio Rev.Code, Ann. Sec. 2929.04; Pennsylvania, 18 Pa. S. Sec. 1311 (d). See also the statutes of Indiana, Ind. Ann.Stat. Sec. 10–3401(b); Louisiana, 14 L.S.A. Sec. 30; Oklahoma, 21 O.S.A. Sec. 701.1.

3. See H. L. Menken, ed., A New Dictionary of Quotations, New York, 1972.

4. Id.

5. Even if a degree of probability were specified, the contradiction inherent with the standard of proof beyond a reasonable doubt would remain, as would the due process problem of punishing for possible future conduct. Cf. Baker v. State, Tex.Cr.App., 478 S.W.2d 445, 448.

6. R. K. Young and D. J. Veldman, Introductory Statistics for the Behavioral Sciences, 2nd ed., New York, 1972.

cannot be more than 1.00 (where all possible events are favorable) nor less than .00 (where no event is favorable.)."

Certainly this clear, yet technical, definition of probability, though without vagueness in the meaning of the term itself, leaves much vagueness in the issue submitted under Article 37.071(b)(2), because with this clear definition the question would by its terms be answered in the affirmative for all men, no matter how saintly, and no such intent can reasonably be attributed to the Legislature. We must recognize, then, that this least vague of definitions leaves the greatest vagueness in the statute.

Having rejected the common sense understanding and the technical definition as inadequate, let us examine the legal definition of "probability" to determine if it has a meaning sufficiently free of vagueness to give the notice required. In 72 C.J.S. Probability p. 968 we find the following definition:

> "The word 'probability' implies consideration of probative facts, and in ordinary language it also implies *doubt*.
>
> " * * *
>
> "In the doctrine of chances, probability is the likelihood of the occurrence of an event, or the quotient obtained by dividing the number of favorable chances by the whole number of chances.
>
> "In legal writings and opinions, '*assumption*,' '*inference*,' '*presumption*,' and '*probability*' have been said to have substantially the same meanings. . . ." (Emphasis supplied.)

As can be seen, this explanation leaves as much vagueness in the statute as we have found in either of our earlier considerations of the term.

Article 37.071 is so confusing that even the majority of this Court have been misled. They have not even addressed the vagueness inherent in Article 37.071(b)(2),

and have failed to remove from my mind the vagueness of that issue upon which the operation of this mandatory statute pivots. I would hold the statute unconstitutionally vague in violation of Article 1, Section 10, Texas Constitution, and the due process clause of Amendment XIV, United States Constitution.

The invalidity of Art. 37.071, V.A.C.C. P., however, would not invalidate Article 1257, V.A.P.C., nor would it require reversal of this case. If Article 37.071 were held unconstitutional, as it should be, the only remaining punishment available under Article 1257(b) would be life. The proper disposition of this case, in light of the invalidity of the procedure for imposing the death penalty, would be to reform the judgment to provide for life imprisonment. See Haines v. State, Tex.Cr.App., 391 S. W.2d 58, 60 (on motion for rehearing).

I therefore concur in the affirmance of this conviction, but would reform the judgment to life.

ROBERTS, Judge (dissenting).

I dissent. The majority opinion fails to address the most crucial issue presented by this appeal. Because of the importance of this case, I set out the reasons for my dissent in some detail.

I.

I turn first to Art. 37.071(b)(2), Vernon's Ann.C.C.P., noting that this provision basing the imposition of capital punishment upon the probability of future events appears to be unique to this State. A survey of the capital punishment statutes of other states fails to reveal any provision similar to the "probability" issue of Article 37.071. In all the statutes reviewed, the aggravating circumstances upon which imposition of the death penalty rests concern either *prior* acts of criminal conduct or the means of circumstances surrounding the commis-

sion of the offense for which the accused is on trial.[1]

The threshold question in this appeal, as presented by appellant's first ground of error, is: What did the Legislature mean when it provided that a man's life or death shall rest upon whether there exists "a probability" that he will perform certain acts in the future? The question is not an academic one, since a significant part of appellant's challenge is that the phrase "a probability" is so vague and overbroad as to be unconstitutional, and that this overbreadth is compounded beyond logical and rational understanding by the statutory requirement that the stated "probability" must be proved beyond a reasonable doubt.

In view of this serious challenge to the statute now confronting us, it is incumbent upon this Court to determine whether it is possible to define the phrase "a probability." This the majority has not done.

Since the phrase "a probability" is not defined within Article 37.071 itself, a further search is necessary.

## II.

I necessarily begin with an examination of the Code of Criminal Procedure itself. Article 3.01, V.A.C.C.P., requires this Court to construe all "words, phrases and terms used in this Code" in their "usual acceptation in common language, except where specially defined." [2]

However, we must also be guided by the Texas Code Construction Act, which applies to any amendment to our Code of Criminal Procedure enacted by the 60th or any subsequent Legislature. Art. 5429b–2, Sec. 1.02(2), Vernon's Ann.Civ.St. (Supp.

1974); Barbee v. State, 432 S.W.2d 78, 82 (Tex.Crim.App.1968), cert. den. 395 U.S. 924 (1969). Since Article 37.071, as noted earlier, was enacted in 1973 by the 63rd Legislature, it falls within the province of the Code Construction Act. Section 2.01 of the Code Construction Act, which is clearly more specific than Art. 3.01, V.A. C.C.P., supra, is as follows:

> "Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.[3]

A careful reading of this language compels me to conclude that if there is a "technical or particular meaning" of the phrase "a probability," we are bound to construe that phrase accordingly.

I find that there is a widely accepted "technical definition" of the word probability.

Webster's [4] gives a typical example of this definition:

> "In the doctrine of chance, the likelihood of the occurrence of any particular form of an event, estimated as the ratio of the number of ways in which that form might occur to the whole number of ways in which the event might occur in any form (all such elementary forms being assumed as equally probable); the limit of the ratio of the frequency of that form of the event to the entire frequency of the event in all forms as the number of trials is increased indefinitely. Thus, as an unweighted die thrown up may fall equally well with any of its six

---

1. See, e. g., the statutes of California, Cal. Penal Code Sec. 190.2; Colorado, CRS 39–11–103(6); Ohio, Ohio Rev.Code Ann. Sec. 2929.04; Pennsylvania, 18 Pa. S. Sec. 1311 (d). Also see the statutes of Indiana, Ind. Ann.Stat. Sec. 10–3401(b); Louisiana, 14 L.S.A. Sec. 30; Oklahoma, 21 O.S.A. Sec. 701.1.

2. Cf. Art. 8, V.A.P.C. (1925).

3. Compare Art. 10, V.A.C.S. (1969).

4. Webster's New International Dictionary of the English Language (2d Ed. Unabridged 1944), pp. 1970–1971, syl. 3; for other similar examples see: 2 Compact Edition of the Oxford English Dictionary (1971), p. 2309, syl. 3; Random House Dictionary of the English Language (Unabridged Ed. 1967), p. 1146, syl. 4.

faces up, there are six ways of happening; the ace can turn up in only one way; the chance of the ace is 1 out of 6 (⅙)."

Thus defined, a probability is simply a chance—however large or small—as measured and defined in mathematical or statistical terms.

Certainly this clear definition of probability, though without vagueness in the meaning of the term itself, leaves much vagueness in the issue submitted under Article 37.071(b)(2), because even with this definition *the question would by its terms, be answered in the affirmative for all individuals*, no matter how saintly. That is, there is beyond any doubt *some* mathematical chance that all persons "would commit criminal acts of violence that would constitute a continuing threat to society."

I doubt that such a definition and such a construction were intended by the Legislature. Further, I am ever mindful of the important rule of construction that statutes carry with them a strong presumption in favor of their validity. Art. 5429b–2, supra, Sec. 3.01(1); Ex Parte Wilson, 374 S.W.2d 229, 231 (Tex.Cr.App.1964); Delorme v. State, 488 S.W.2d 808, 811 (Tex. Cr.App.1973). I feel bound nonetheless by the requirement of Section 2.01 of our Code Construction Act, which requires us to adopt the technical meaning of the phrase, regardless of whether it has obtained that meaning "by legislative definition *or otherwise*." [5]

The conclusion is thus inescapable that the appellant's punishment was decided to a significant degree by the answer to a question which—as a result of its vagueness and overbreadth—*could not have been answered in his favor.* It is equally clear that such a procedure violates due process and thus constitutes error. [6]

### III.

Nor can I conclude that the error was harmless. At the outset, it is clear that in enacting Article 37.071 the Texas Legislature responded to the Supreme Court's opinions in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), by putting strict limits on the jury's discretion in assessing the death penalty, but *not* by eliminating such discretion entirely. See Coley v. State, 231 Ga. 829, 204 S.E. 2d 612, 615 (1974). It is equally clear from the foregoing analysis of subsection (b)(2) of Article 37.071 that subsection (b)(2) allows no discretion whatsoever to the jury called upon to answer a special issue drafted in accord with its language. Such a special issue must always be answered "yes," and the statute is thus made more mandatory in the instant case

5. I have strong reservations about *any* construction which places technical definitions above common sense understanding. But my respect for the law and the institutional integrity of our state government requires me to yield to the clear intent of our Legislature, as embodied in the language of Section 2.01, supra. See Duncan v. Magette, 25 Tex. 245, 253–254 (1860). I would add that even with a common sense definition of probability, subsection (b)(2) has serious flaws. See the separate opinion of my brother Odom, as well as footnote 6, infra.

6. I have other, graver reservations about subsection (b)(2). Under this subsection we go beyond our traditional understanding of reasonable doubt, which is based on the defensible premise that where acts have been performed, they can be proven to have produced an incident beyond a reasonable doubt.

This concept has been tried, tested, and proven valid.

But under subsection (b)(2) the jury is required to find beyond a reasonable doubt that an individual, the defendant, will *in the future* perform certain acts. This adopts the principle of predestination: That man is destined to do certain things and hence has no control over his actions. If this be true, we should not punish or attempt to rehabilitate, since the defendant is no more responsible for his acts than an individual who is insane at the time he commits an offense.

However, if individuals are responsible for their acts—as I believe—this cannot be true; yet if individuals are so responsible, (b)(2) is unconstitutional, since it is impossible to prove beyond a reaonable doubt or to a moral certainty that a person will act in a certain manner in the future.

by a factor of one-half. This was clearly not the intent of the Legislature. See the discussion of *Furman,* infra.

It must also be noted that a proper statutory construction of subsection (b)(2) substantially increases a defendant's chances of receiving the ultimate penalty. Thus, under such a construction, the appellant in this case was not, as he thought, confronted with two special issues, with the knowledge that a negative answer to either one of them would save him from the death penalty; he was instead faced with only one such issue, since a negative answer to special issue number two was by definition foreclosed. The appellant's actual chance of receiving the death penalty was therefore increased by one-half. Since the statute was 50 percent more mandatory than the appellant could have realized, I fail to see how he could *not* have been harmed.

The error clearly was not harmless beyond a reasonable doubt, Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967); consequently, the judgment should be reversed.

### IV.

Justice under law requires that I not end this inquiry on such a note. It must next be asked whether this unconstitutional portion of Article 37.071 renders the entire statute invalid. Delorme v. State, supra.[7]

As noted earlier in this opinion, Article 37.071 was created by the 63rd Legislature as part of Chapter 426 of the Acts of that Legislature. Section 7 of that Chapter provides:

"If any provision of this Act or the application thereof to any person or cir-

cumstance is held invalid, such invalidity shall not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable."[8]

Before we can determine whether a portion of an Act is severable, it is obvious that we must first be able to "give effect" to the remainder of the Act. I therefore turn to the issue of the constitutionality of Article 37.071, supra, Article 1257, supra, and the remainder of Chapter 426.

Appellant urges that Article 37.071 and Article 1257 violate the Eighth and Fourteenth Amendments of our Federal Constitution. Appellant specifically relies upon Furman v. Georgia and Branch v. Texas, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

This Court stated in Lopez v. State, 500 S.W.2d 844, 846 (Tex.Cr.App.1973), that "the per curiam opinion and the nine separate opinions filed by the Justices of the United States Supreme Court, in *Furman* and *Branch,* leave much to be desired from the standpoint of clarity . . . ." An examination of those opinions reflects that while two of the Justices in the *Furman* "majority" would totally abolish the death penalty in this country, 408 U.S. at 257–306, 314–374, 92 S.Ct. 2726, the three other Justices voting to reverse limit their condemnation to the unfettered nature of the discretion given to judges and juries called upon to decide the issue. 408 U.S., at 240–257, 306–314, 92 S.Ct. 2726.[9]

---

7. In *Delorme,* this Court found a portion of Article 152, V.A.P.C., to be unconstitutional. We nonetheless held that the statute could be validly enforced by excising the offending portion. Delorme v. State, supra, 488 S.W.2d, at 811–812.

8. Even without this severability clause, it would be necessary to determine whether the

invalidity of the subsection (b)(2) renders all of Article 37.071 invalid. See Delorme v. State, supra, and cases there cited.

9. I also note that the four dissenting Justices concluded—for various reasons—that the death penalty was constitutional as currently applied by the various states. 408 U.S., at 375–470, 92 S.Ct. 2726.

**950**

In applying *Furman* to non-mandatory death penalty statutes like our own, the courts in some other states have—quite properly, I believe—looked to these three latter opinions for whatever guidance they dared to glean from *Furman.* See, e. g., Coley v. State, 231 Ga. 829, 204 S.E.2d 612, 614–615 (1974).

I especially agree with the Georgia Supreme Court's interpretation of *Furman.* In *Coley,* that Court convincingly concluded that *Furman* allows "for new legislation by the States permitting the exercise of some controlled discretion through the use of objective standards by which the sentencing authority may be guided in imposing the penalty of death." *Coley,* supra, at 615.[10]

After a careful examination, I have concluded that the remaining portion of Article 37.071—after the excising of subsection (b)(2)—provides for the type of controlled discretion and objective standards contemplated by the opinions in *Furman.* I would hold that the statute, minus the offending subsection, is constitutional and should be so enforced. Furman v. Georgia, supra; Delorme v. State, supra.[11]

Appellant also challenges other portions of the death penalty act. Along with the majority, I have concluded that the remainder of Chapter 426, like the unsevered segment of Article 37.071, is constitutional.

The judgment should be reversed and the cause remanded.

---

10. I also agree with the Georgia court's emphasis on *new* legislation. Like the Texas Legislature, the Georgia General Assembly enacted a new death penalty statute after the decision in *Furman.* A mere re-interpretation of a death penalty statute in effect prior to the decision in *Furman* might well be subject to a serious challenge as an ex post facto law. Cf. Commonwealth v. Harrington, 323 N.E.2d 895, 16 Cr.L. 2506, 2507 (Mass. 1975).

11. In doing so I reiterate what this Court said in Tezeno v. State, 484 S.W.2d 374, 377 (Tex.Cr.App.1972). "This Court holds to the opinion that it has enunciated many times before that under the Constitution of the United States or the State of Texas, that the death penalty is not cruel and unusual punishment." See also State v. Dixon, 283 So.2d 1, 6 (Fla.1973).