Ronald Curtis CHAMBERS, Appellant,

v.

The STATE of Texas, Appellee.

No. 54676.

Court of Criminal Appeals of Texas, En Banc.

May 24, 1978.

Vincent W. Perini, Dallas, for appellant.

Henry Wade, Dist. Atty., W. T. Westmoreland, Jr., Jim Burnham, Douglas D. Mulder and Stephen Tokoly, Asst. Dist. Attys., Dallas, Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

Ronald Curtis Chambers appeals from a conviction for capital murder wherein the punishment was assessed at death.

Shortly after midnight on April 11, 1975, Mike McMahan and Deia Sutton, both college students, left a Dallas nightclub and entered McMahan's car. Appellant, Clarence Ray Williams, Jr., and two other men occupied an adjacently parked automobile. Williams and appellant exited that automobile and forced their way into McMahan's vehicle at gunpoint. Appellant ordered Sutton to get into the back seat with him. After laying a .410 shotgun on the rear floorboard, he pointed a pistol at her face and threatened to kill her.

McMahan was moved to the passenger side of the front seat. Williams then drove the car to the Trinity River bottoms while appellant robbed Sutton of her watch, coat, purse and its contents.

Williams parked the car on a levee when they arrived at the river bottoms. He and appellant pushed the students down the

side of the levee and, when they got near the bottom, appellant ordered them to stop. At this point five shots were fired at them, one of which lodged in Sutton's skull. Both fell to the ground at the bottom of the levee.

Williams and appellant, apparently believing that the victims were dead, returned to the car. McMahan shouted at Sutton, asking her if she were hurt. The assailants heard him and came back to the levee. Appellant dragged McMahan to the water where he beat him viciously with the shotgun. Williams beat the woman with his fists and then choked her. When McMahan stopped screaming, appellant hit Sutton with the shotgun several times. Williams then remarked, "Well, she's dead, let's go."

After Williams and appellant had left, Sutton crawled over to McMahan and attempted to aid him. He was dead. Somehow she got to the Le Baron Hotel where police were summoned.

Officer C. R. Heyse subsequently found McMahan's body in the river bottoms. He also found a .410 gauge shotgun shell which had not been fired but which had its primer indented, a shotgun breech, and part of a gun stock.

Stephanie Jones observed appellant later that morning at her mother's house. He was washing blood and hair off a shotgun. Appellant tried to sell Sutton's coat that had been taken in the robbery.

Officer H. O. Wilkerson arrested appellant the next day. A shotgun, which was broken into several pieces, several .410 cartridges, and a .22 caliber hollow-point rifle bullet were found in the Jones' house. Credit and identification cards belonging to the deceased and Sutton were also discovered there.

An autopsy revealed that massive skull fractures and brain injuries caused McMahan's death. Part of the deceased's cranial bone had been driven into the brain, and one of his ribs had been fractured and driven into the lung. He also had suffered gunshot wounds to the right arm and to the abdomen. The latter wound was made by a .22 caliber hollow-point rifle bullet which was recovered from his right hip.

## I. *The Voir Dire Examination*

■ Appellant complains that the entire jury selection process was infected with constitutional error. Initially he urges that the court erred in excusing upon challenge for cause seventeen prospective jurors for bias against the minimum punishment for murder. Each prospective juror expressed his bias against the minimum punishment and stated that he was unable to consider such punishment in a murder case. The court excused each upon challenge by the State.

In *Moore v. State*, 542 S.W.2d 664 (Tex. Cr.App.1976), we held that Article 35.16(b), V.A.C.C.P., authorizes the State to challenge for cause prospective jurors who oppose the minimum punishment. Appellant concedes that *Moore* was decided adversely to him, but argues that there is no basis for sustaining a challenge to veniremen who oppose the minimum punishment for a lesser included offense.

Subsection (b)(3) of Article 35.16 provides that the State may challenge if the prospective juror "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment."

For these reasons we find no error in the excusing of the prospective jurors challenged on the basis of their bias against the minimum punishment for murder.

■ Appellant also urges that prospective juror Veltman was erroneously excused for his bias against the minimum punishment for murder. The record discloses that Veltman was not excused on this basis but was excused because he recalled news accounts concerning the instant offense, and because his home had been recently burglarized and was disturbed that the burglars received probation in that case. No error is reflected.

Next, appellant contends that eighteen veniremen were excused in violation of

*Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[1]

In *Hovila v. State*, 532 S.W.2d 293 (Tex. Cr.App.1975), we held that the holding of *Witherspoon* was still alive and well in light of the new statutory scheme providing for the imposition of the death penalty, the adoption of which followed in the wake of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

The new statutory scheme for capital murder [V.T.C.A., Penal Code, Section 19.03 (formerly Article 1257, V.A.P.C., as amended in 1973) and Article 37.071, V.A.C.C.P.], including the possible infliction of the death penalty, has been upheld by this Court in *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App. 1975), and by the United States Supreme Court in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). See also *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

With this background we turn to the examination of the veniremen in question.

■ Prospective jurors Everett, Davis, Andrews, Arboqast, Fry, George, Wolford, Plamo, Bullock, Patterson and Null were excused without objection. Failure to object to the constitutionally improper exclusion of veniremen waives that right and such exclusion cannot be considered on appeal. *Boulware v. State*, 542 S.W.2d 677

(Tex.Cr.App.1976), cert. denied 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977). See and compare also *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

■ Prospective jurors Nixon, Meigs and McQueen did not believe in the death penalty and would not vote for that penalty under any circumstances. These prospective jurors were excused in compliance with *Witherspoon*.

■ Prospective jurors Hamilton, Chase and McLarty expressed strong opposition to the death penalty and stated that their beliefs would affect their deliberations on the fact issues submitted to them.

V.T.C.A., Penal Code, Section 12.31(b), provides:

"Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."[2]

In *Moore v. State*, supra, this Court held that it was unnecessary to consider the *Witherspoon* question where a prospective juror had stated that her opposition to the death penalty would affect her delibera-

---

1. In *Witherspoon*, the Supreme Court of the United States stated:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." The Court further stated:

"Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." The Court elaborated in *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969):

"[i]t is entirely possible that a person who has a 'fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law—to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case."

And, in *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), the Court reaffirmed its adherence to the *Witherspoon* doctrine and held that no death penalty can stand if a single venireman is excluded in violation of that doctrine.

2. A similar provision was contained in Article 1257(d), V.A.P.C., 1925, as amended (Acts 1973, 63rd Leg., p. 1122, ch. 426—effective June 14, 1973 until January 1, 1974—effective date of present Penal Code).

tions upon the fact issues submitted in the case. We conclude that prospective jurors Hamilton, Chase and McLarty in the instant case were properly excused under the State statutory provision. *Moore v. State,* supra; *Burns v. State,* 556 S.W.2d 270 (Tex. Cr.App.1977).

■ Further, appellant made no objection in the trial court to the disqualification of potential juror McLarty on the basis now urged that she was excused in violation of *Witherspoon.* He waived any right to complain of her disqualification on appeal. *Burns v. State,* supra. See also *Boulware v. State,* supra.

■ Prospective juror Godbolt expressed his opposition to the death penalty and then vacillated as to whether his beliefs would affect his deliberations on the fact issues submitted to the jury. He finally decided that these beliefs would not influence his deliberations on those issues. While it might be argued as to whether Godbolt's testimony would have disqualified him under the holding in *Witherspoon,* the record reflects that the court excused him for personal business reasons over the objection of appellant.

Godbolt stated that he was the manager of a barber shop and that he had only one employee who also had been called for jury duty at that time. He related that he would have to close down his business if he served on the jury and that he was already in financial trouble because he was attending school as well as managing the barber shop.

The conduct of the voir dire examination must rest largely within the sound discretion of the trial court. *Moore v. State,* supra; *Abron v. State,* 523 S.W.2d 405 (Tex. Cr.App.1975). It is clear from the record in the present case that prospective juror Godbolt was preoccupied by personal and business problems that would interfere with his ability to serve on the jury. We find no abuse of discretion in the court excusing him. Cf. *Moore v. State,* supra.

■ Appellant again urges that the court erred in sustaining a challenge for cause to a prospective juror, Doris Minicks.

She was a secretary for the Department of Housing and Urban Development. It was developed that the father of Sam Hudson, appellant's trial counsel, was also an employee there but "in another section." When asked whether she knew Hudson's father, Minicks stated that she had spoken to him but did not really know him personally. She then testified as follows:

"Q. Would it put you in an uncomfortable position, I mean I know you don't know Sam Hudson personally, but since you know his dad, would it put you in an uncomfortable position if you found against Sam's client, for example, and had to go back there and work with his dad?

"A. No. See, I don't work with him directly. I see him in the hall. He—he works in another section and I'm in another section and I just see him, you know, to speak to him; other than that—

"Q. Oh, I see. Well, if you think it might affect, you know, your business or, for that matter, listening to the testimony in some way, then that's fine.

"A. I don't think—you know, I don't think it would.

"THE COURT: Both of you work for the government?

"MISS MINICKS: Uh-huh.

"THE COURT: Federal government? You all have lunch in the same place?

"MISS MINICKS: No, I've never had lunch with him, no.

"THE COURT: How did you know that was his dad?

"MISS MINICKS: Somebody—let me see. One of the attorneys I work with told me that his son was an attorney and, you know, somebody pointed him out to me.

"THE COURT: You've never had any business dealings with him?

"MISS MINICKS: No, he don't know me at all.

"THE COURT: What's the State's position?

"MR. BURNHAM: Well, Judge, we feel like that since she does know Sam's dad it might be better for her to sit on another case and that way neither side would have someone on the jury that they know; we wouldn't want someone on the jury that we know.

"THE COURT: I think that's more or less a fair proposition. Don't you? You look like an awful fair-minded young lady. I'm going to agree with that because, after all, you'd run into him when this is over with and there you'd be, you know. You're very fair minded. Thank you so much. I'm sorry you had to wait so long to find this out."

Minicks was excused over appellant's objection.

Article 35.16(a), supra, provides, in part, that:

"A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made by either the State or the defense for any of the following reasons:

" * * *

"8. That he has a bias or prejudice in favor of or against the defendant."

In *Pigg v. State*, 162 Tex.Cr.R. 521, 287 S.W.2d 673 (1956), a juror knew the injured party "only when he saw him." We held that such a relationship would not affect the juror's verdict and was not grounds for mistrial.

The record in the instant case is devoid of any hint that Miss Minicks could not be a fair and impartial juror. The fact that she worked in the same building as defense counsel's father did not render her "incapable or unfit to serve on the jury." We find that the court abused its discretion in excusing her.

However, because there is no showing that appellant did not receive a fair and impartial jury, and because the State exercised only 13 of its 15 peremptory challenges, one of which could have been used to remove prospective juror Minicks, no re-

versible error is shown. *Culley v. State*, 505 S.W.2d 567 (Tex.Cr.App.1974); *Weaver v. State*, 476 S.W.2d 326 (Tex.Cr.App.1972). And cf. *Henriksen v. State*, 500 S.W.2d 491 (Tex.Cr.App.1973).

▮ Appellant next contends the trial court erred in sustaining the State's challenge for cause to prospective juror Patricia Brightman.

Brightman stated that she would require evidence of premeditation to support a capital murder conviction even though Texas law does not require such evidence. After much effort by defense counsel to rehabilitate her she then stated that she would adhere to the law despite her personal feelings. The record then reflects the following:

"Q. Now, Miss Brightman, I won't belabor the point, but I had just asked you the same question and you had said that you would require some evidence of premeditation.

"A. Yes.

"Q. Is that still the way you feel ?

"A. My personal feeling—

"Q. Yes.

"A. —yes, that's the way I feel. But going by the law, then I would have to go by the law.

" * * *

"Q. All right, my question is: Before you could find him guilty of murder where he's going to get a sentence of death or a sentence of life, would you have to have some evidence of premeditation?

"A. Well, my—

"MR. HUDSON: Object to the question, Your Honor. She's answered it.

"THE COURT: Well, since she's answered both ways—.

"A. My personal feeling, I would have to, but by the law, I would have to go with everyone else. This is my personal feeling. I would have to have some evidence, but if I had to go by the law—"

Although there was much vacillation on Brightman's part, it appears that she would probably require some evidence of premeditation and thus could not follow the law. Premeditation is not an element of a murder case. The court's ruling that she was subject to challenge on this basis was sanctioned by Article 35.16(b)(3), supra. No error is shown. Further, the State did not exercise two of its peremptory challenges. One could have been used on this prospective juror as well as with the prospective juror Minicks.

■ Appellant contends that the trial court erred in overruling his challenge for cause to venirewoman Mrs. Rayford Bolin and in refusing to grant him an additional peremptory challenge in connection with her examination.

Mrs. Bolin was the last prospective juror interrogated and last juror chosen. During the voir dire examination, she stated that her husband, an insurance agent, had an ongoing business relationship with Deia Sutton's father. Although Mr. Bolin handled Mr. Sutton's insurance matters and knew the Sutton family, Mrs. Bolin did not know them personally. She related that she learned of the business connection with Deia's family when she and her husband discussed appellant's case several months prior to trial. She then testified as follows:

"Q. Yes. Do you feel that this would cause you any problems in serving as a juror and seeing her in court and, of course, your husband would know and the family would know, I assume, possibly. We're trying to get a fair—

"A. Yes.

"Q. —you see, and that's what we're looking for, this sort of thing—

"A. Yes, right.

"Q. —exactly.

"MR. TOKOLY: Well, I object to that as if there's some innuendo—

"MR. HALSEY: No.

"MR. TOKOLY: —that she could not be fair—

"MR. HALSEY: That's not—

"MR. TOKOLY: —because according to the question—

"MR. HUDSON: Nobody made that kind of innuendo.

"A. Well, see, I don't know the girl. I don't know the family; I don't know anything about them at all. All I know is that they are customers of ours or, I say ours, my husband's.

"Q. Well, let me put it to you this way and I'll explain how there could be a conflict perhaps: You find a defendant not guilty after she says what happened, perhaps this is the man and so forth. You have to go home and tell your husband that 'We found him not guilty,' and he's going to have to tell—

"A. Oh, no, this—this would have no—no bearing, I don't think, at all.

"Q. 'How could you do that to my best customer?'

"A. Oh, we're not on that close a personal relationship with our customers. Most of our customers are names.

"Q. Okay so—

"A. And I say—I use the term 'ours' strictly because, you know, I don't work in the agency and I don't—.

"Q. You don't know the extent of the business then that Mr. Sutton has with your husband?

"A. I have no earthly idea.

"Q. And you don't feel that this would influence you in any way in arriving at a decision?

"A. I don't think so because I don't know the people.

"Q. Well—

"A. But that is a, you know, they are people that we have that—that contact with.

"Q. Okay. And you are telling me that this would not influence you in any way in listening to the testimony and reaching a decision?

"A. I don't think so. No, I really don't, but I can only say that, see.

"Q. Right, right.

"A. I'm saying what I really think.

"THE COURT: That's all you can do lady, you've told the Court here it will not, is that right?

"MRS. BOLIN: Yes.

"THE COURT: All right, let's get on to something else."

Thereafter, defense counsel inquired whether Mrs. Bolin was prejudiced against blacks. She responded that she did not think she was, "any more than the average person my age who's lived in Texas all their life." She later stated that she was not bigoted and that she would be a fair and impartial juror.

Mrs. Bolin was accepted as the twelfth juror. Appellant challenged her on the grounds that she was racially prejudiced and that her husband had a business relationship with Deia Sutton's father. However we find on the record before us that the court properly overruled the challenge for cause on the ground of racial prejudice. See Article 35.16(a)(8), supra.

■ With respect to the business relationship between the juror's husband and Mr. Sutton, we stated in *Moore v. State*, supra, the following:

". . . The statute (Article 35.16, V.A.C.C.P., is divided into three parts, providing challenges for cause which both the State and the defense *may* make, those which the State *may* make and those which the defense *may* make. We find nothing in the statute which renders these lists an exclusive basis for challenges for cause. Challenges for cause not based on any ground mentioned in the statutes are ordinarily addressed to the sound discretion of the trial judge. . . ." 542 S.W.2d at 669.

In the instant case, Mrs. Bolin did not know the Sutton family personally and she testified that her husband's business connection with the family would not affect her ability to sit as a fair and impartial juror. We find no abuse of discretion by the court in overruling the challenge for cause and denying the additional peremptory challenge on this ground.

■ Appellant next contends that the trial court unreasonably restricted the voir dire examination of prospective juror Mrs. Carl Nelson.

The record discloses that defense counsel attempted to question Mrs. Nelson about the meaning of the term "deliberately" as that term is used in Article 37.071(b)(1), V.A.C.C.P.—the first special issue to be submitted to the jury at the punishment phase of the trial. He first asked her whether she thought deliberate conduct meant carefully considered conduct. When she responded affirmatively, the prosecutor objected on the ground that defense counsel was inferring that the State was required to prove premeditation. The court sustained the objection on the basis that the term "deliberately" as used in the statutory provision was given its commonly accepted meaning, "what it means to her (Nelson)." The court then refused to permit defense counsel to explore the matter further. Appellant's objection was overruled.

In the case at bar, the voir dire examination was limited with respect to certain questions as to one prospective juror only. She was chosen as the second juror when defense counsel stated that appellant "will be happy to accept this juror." Voir dire examination could take an unreasonable length of time if attorneys on both sides selected different words throughout a contemplated charge and asked each prospective juror what those words meant. We find no abuse of discretion.

■ In another ground of error, appellant complains that the trial court erred in excusing prospective juror Delgadillo without challenge either by the State or the defense. A court should not, on its own motion, excuse any prospective juror for cause unless he is absolutely disqualified. *Valore v. State*, 545 S.W.2d 477 (Tex.Cr.App.1977); *Pearce v. State*, 513 S.W.2d 539 (Tex.Cr.App.1974).

■ Delgadillo was a statistician and had extensive training in mathematical probability theory. With regard to Article 37.071(b)(2) V.A.C.C.P., whether there is a

probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society—Delgadillo stated that that issue could not be determined with reason and logic. He related that, from a statistical standpoint, whether an act will probably occur in the future cannot be proven beyond a reasonable doubt. The court then determined that the prospective juror was biased against that phase of the law and excused him.

Whether or not the concept of determining the probability of future conduct is mathematically viable, it is clear that the concept is viable in law. See *Jurek v. Texas,* supra. As a result the State was entitled to rely upon this phase of the law for punishment. We conclude that prospective juror Delgadillo was disqualified under Article 35.16(b)(3), supra, and that the court properly excused him.

## II. *The Punishment Phase*

Appellant contends that the evidence at the punishment phase of the trial is insufficient to show that he would probably commit criminal acts of violence that would constitute a continuing threat to society. See Article 37.071(b)(2), supra.

Dr. James Grigson testified that he had examined appellant and diagnosed him to be a severe sociopath who was not insane but who had no respect for anyone else's life or property. Dr. Grigson expressed the opinion that appellant was aware of the difference between right and wrong, that he understood the nature and quality of his acts, and that he showed no remorse for the instant offense. He further testified that there was no known cure for appellant's personality disorder and that he would continue to be an absolute threat to society.

This testimony, in conjunction with that offered at the guilt phase of the trial, is sufficient to sustain the jury's affirmative answer to the second issue submitted at the penalty phase. Cf. *Moore v. State,* supra; *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App. 1976).

3. Psychiatric opinion testimony is admissible at the punishment phase of the trial on behalf of the defendant as well as on behalf of the State.

Appellant next contends that psychiatric opinion testimony is inadmissible to show that the defendant would constitute a continuing threat to society. The thrust of his argument is that the discipline of psychiatry is not sufficiently advanced to permit predictions of future violent behavior. Although his counsel had submitted a well-written brief citing many authorities on the subject of psychiatric diagnosis, his contention was rejected in *Moore v. State,* supra.[3] See also *Livingston v. State,* 542 S.W.2d 655 (Tex.Cr.App.1976); *Gholson and Ross v. State,* 542 S.W.2d 395 (Tex.Cr.App. 1976); and *Smith v. State,* supra.

Appellant next contends the State did not establish that Dr. Grigson was qualified to give expert opinion testimony.

Dr. Grigson was certified by the American Board of Neurology and Psychiatry and was a member of several medical and psychiatric organizations. He had examined over 7,000 felony defendants in the course of his practice. His psychiatric evaluation of appellant was within his area of expertise, and, thus, he was well qualified to state his opinion regarding the probability that appellant would be a continuing threat to society. Cf. *Hogan v. State,* 496 S.W.2d 594 (Tex.Cr.App.1973).

We further observe that appellant made no objection at trial to the qualifications of the expert witness. Hence, nothing is preserved for review. *Jackson v. State,* 477 S.W.2d 879 (Tex.Cr.App.1972).

Appellant urges that Dr. Grigson's opinion testimony was improperly admitted because it was based on hearsay.

The psychiatrist made several references to documents or reports that he had read concerning the offense. But he also testified that he had thoroughly examined appellant and diagnosed him on the basis of that examination before he read those reports. No error is shown.

See *Robinson v. State,* 548 S.W.2d 63 (Tex.Cr. App.1977).

Appellant asserts that Dr. Grigson's opinion regarding appellant's propensity to commit future acts of violence was improperly admitted because it invaded the province of the jury. This rationale was repudiated in *Hopkins v. State*, 480 S.W.2d 212 (Tex.Cr.App.1972). There, we set forth the following criteria which must be met before expert opinion testimony can be admissible: (1) the witness must be competent and qualified to testify; (2) the subject must be one upon which the aid of an expert's opinion will be of assistance to the jury; and (3) his testimony may not state a legal conclusion. Those criteria were met in the instant case. Appellant's contention is overruled.

Next, appellant urges that Dr. Grigson's testimony was improperly admitted because he failed to comply with the provisions of Article 46.02, Section (3)(d), V.A.C.C.P., which provides:

"A written report of the examination shall be submitted to the court within 21 days of the examination, and the court shall furnish copies of the report to the defense counsel and the prosecuting attorney. The report shall include a description of the procedures used in the examination, the examiner's observations and findings pertaining to the defendant's competency to stand trial, and recommended treatment. If the examiner concludes that the defendant is incompetent to stand trial, the report shall include the examiner's observations and findings about whether there is a substantial probability that the defendant will attain the competence to stand trial in the foreseeable future."

Dr. Grigson was appointed by the court to examine appellant and determine whether he was competent to stand trial and whether he was sane at the time of the offense. The psychiatrist was thus required to submit a report of that examination. The record, however, contains no such report and there is no showing that one was ever submitted. But the record also reveals that no issue of insanity at the time of the offense or of incompetency to stand trial

was raised. Appellant did not request a copy of the report for any purpose and did not object at trial on the ground that the report was not submitted. No harm is shown.

In five grounds of error, appellant asserts that the trial court erred in permitting Dr. Grigson to testify with regard to matters concerning the psychiatric examination.

No objection was made to any of the testimony now challenged. Nothing is presented for review. *Braxton v. State*, 528 S.W.2d 844 (Tex.Cr.App.1975); *Ryan v. State*, 523 S.W.2d 954 (Tex.Cr.App.1975).

In his next contention, appellant argues that the court erroneously permitted Dr. Grigson to describe sociopaths as manipulative.

The record reflects that Grigson, having diagnosed appellant as a sociopath, testified that persons suffering from such a personality disorder never develop a conscience or feel remorse, guilt, or shame. He further testified that sociopaths are convincing liars and have the ability to manipulate "people, lawyers, preachers, doctors" and jurors "as long as it's to their advantage. . . ." Appellant's objection was overruled.

His analysis of the sociopathic personality was permissible expert testimony and thus was properly admitted. It is further observed that appellant did not testify at trial. No error is shown.

Appellant complains of several answers given by Dr. Grigson during cross-examination.

The record reflects the first challenged remark was made as follows:

"Q. (Defense counsel) Dr. Grigson, really, I'm not trying to belabor the point, I'm not trying to be, well, offensive or anything like that, but I must say that I don't think the question was answered because the pattern that I'm speaking of has to be supported by some other incidents—

"A. Yes, sir.

"Q. —that you—

"A. Yes, sir.

"Q. —are aware of.

"A. Yes, sir, I'm sorry, I misunderstood. Yes, that is true. You have one human being that is dead that did not die of natural causes. And in order to get what you want, we would have to have two dead, three dead, four dead, twenty dead. With my training and my experience, my profession states, 'Doctor, you are qualified to call, diagnose somebody that is like this. You can diagnose them as a sociopathic personality disorder of a very severest degree.' My profession doesn't state that I've got to wait until he kills twenty people before I can call him a sociopath."

An objection was overruled.

Dr. Grigson had previously testified as follows:

". . . Now, sometimes the person doesn't die, but, now, this type problem where an individual has, without a conscience, taken another human being's life in the manner in which this was done, this was not somebody in war shooting at another person; this was not somebody defending their home or defending their wife; this was a stranger that was killed, and murdered. This in itself, without the conscience, it says, 'Say, that is a sociopath.' He doesn't have to kill a dozen times before you can say, 'Now then we know it,' you know. He's already—you know it now; now is when you know it."

■ There was no objection to this testimony. The improper admission of evidence does not constitute reversible error if the same facts were shown by facts to which no objection was addressed. *Watson v. State,* 532 S.W.2d 619 (Tex.Cr.App.1976); *Hayles v. State,* 507 S.W.2d 213 (Tex.Cr. App.1974).

■ During further cross-examination Dr. Grigson was asked why another examination of appellant was not needed. He answered that another psychiatric examination of appellant was unnecessary to determine whether he would present a continu-

ing threat to society. Dr. Grigson then commented that "I don't need to see him again and put my life in jeopardy. . . ." The court sustained appellant's objection and instructed the jury to disregard the remark. Appellant contends the court erred in overruling the motion for mistrial.

The trial court's prompt instruction in the instant case cured any error. Appellant was not entitled to a mistrial. Cf. *Tristan v. State,* 510 S.W.2d 329 (Tex.Cr.App.1974).

■ Appellant next complains that Dr. Grigson referred to him as a "cancerous type person" who should be removed from society. The record reveals that Dr. Grigson had used the cancer metaphor earlier without objection. Any error was waived. *Watson v. State,* supra; *Hayles v. State,* supra.

■ In two grounds of error appellant complains that Dr. Grigson made improper references to extraneous offenses. Dr. Grigson stated that he had discussed "previous type trouble" with appellant, and later that appellant had told him some things he (appellant) had done." No objection was made to either statement. Error, if any, was waived. *Braxton v. State,* 528 S.W.2d 844 (Tex.Cr.App.1975); *Vera v. State,* 473 S.W.2d 22 (Tex.Cr.App.1971).

■ Appellant challenges the trial court's limitation of his cross-examination of Dr. Grigson who testified on direct examination that appellant was a sociopath and that he was a continuing threat to society. On cross-examination, appellant asked him whether he had testified to the same effect on behalf of the State in many capital cases. Dr. Grigson responded that he had so testified on numerous occasions whereupon the State objected. The court sustained the objection. There was no instruction for the jury not to consider the statement.

Appellant contends that the excluded testimony was admissible to show bias, prejudice or interest on the part of the State's expert witness and, therefore, bore heavily on his credibility. Appellant, however, did

not ask the court to retire the jury so he could develop the proffered testimony. Absent a showing of what such testimony would have been, or an offer of a statement containing what the excluded evidence would show, nothing is presented for review. Article 40.09, Section 6(d)(1), V.A.C. C.P.; *Stein v. State,* 514 S.W.2d 927 (Tex. Cr.App.1974); *Hicks v. State,* 493 S.W.2d 833 (Tex.Cr.App.1973).

■■■■ ■ The Rev. R. Hunter testified that he had known appellant since he was four years old. After Rev. Hunter stated that appellant's reputation in the community was good, defense counsel inquired whether the minister thought appellant would commit a similar offense in the future. The court sustained the State's objection to the question. Rev. Hunter then was permitted to testify that, to his knowledge, appellant had committed no other acts of violence.

Appellant contends that the court erroneously excluded Rev. Hunter's opinion as to whether appellant would represent a continuing threat to society. Since he did not show what the excluded testimony would have been, nothing is presented for review. Article 40.09, Section 6(d)(1), supra; *Stein v. State,* supra; *Hicks v. State,* supra.

■■■■ In three grounds of error appellant complains of improper jury argument at the punishment phase of the trial. The prosecutor argued as follows:

"Now, as I listened to Mr. Hudson, I thought back and I recall yesterday he was telling you to find the Defendant not guilty because there was a reasonable doubt in the case. Yesterday he wanted you to turn him loose and today he wants you to disregard your belief in the death penalty, . . .
 " * * * *

" . . . Now, ladies and gentlemen, I know and I believe as I'm standing here, from talking to you folks over a long period of days, that you would not be on this jury unless you believed in the death penalty in a proper case. . . .
 " * * * *

"The answer to all three questions is yes and I'm simply going to ask you to follow your oaths and answer them yes. . . ."

No objection was made to the argument now challenged. Hence, nothing is presented for review. *Rodriguez v. State,* 530 S.W.2d 944 (Tex.Cr.App.1975); *Jackson v. State,* 516 S.W.2d 167 (Tex.Cr.App.1974).

Appellant next contends the court erroneously overruled his motion for mistrial after the prosecutor made the following comment during argument:

" . . . And I'm going to suggest something to you, ladies and gentlemen: If Mr. Hudson had seriously believed that this man was sick and not a criminal of the worst kind, as the evidence shows him to be—"

The court sustained the objection and instructed the jury to disregard the comment and overruled the motion for mistrial.

■■■■ Generally, an instruction to disregard is sufficient to cure an error in argument. *McClure v. State,* 544 S.W.2d 390 (Tex.Cr.App.1976); *Gholson and Ross v. State,* supra. We find that the court's prompt instruction in the instant case was sufficient to remove the harm, if any, in the prosecutor's unfinished statement. The motion for mistrial was properly denied. *Thomas v. State,* 519 S.W.2d 430 (Tex.Cr. App.1975); *Morgan v. State,* 502 S.W.2d 695 (Tex.Cr.App.1973).

■■■■ Appellant asserts that the prosecutor improperly referred to an extraneous offense during jury argument. The record reflects:

" . . . And don't you know as he sits here today he wishes with all his heart that he had struck her harder and maybe he wouldn't be sitting where he is."

An objection was overruled.

The prosecutor was referring to the vicious beating which appellant inflicted on Deia Sutton, who lived to give the most damaging testimony against him. She was shot and choked before appellant struck her. When the two robbers thought their

victims were dead, they prepared to leave, but after the young man called to his companion, they went back and inflicted further injuries and killed the young man. Appellant believed Sutton was also dead when he left her and the evidence shows that he wanted her to die. We conclude that the prosecutor's argument was a discussion of, or a reasonable deduction from, the evidence. Cf. *Burns v. State,* supra; *Cain v. State,* 549 S.W.2d 707 (Tex.Cr.App. 1977).

### III. *The Motion for New Trial*

■ Appellant's final contention is that the trial court erroneously excluded evidence of the systematic exclusion of blacks from the petit jury panel at the hearing on the motion for new trial. Appellant's trial counsel made an oral motion to quash the panel on the ground of systematic exclusion at the conclusion of the voir dire examination but made no allegation regarding this or any other racial issue in the motion for new trial. Assuming the contention is properly before us for review, we conclude that it is without merit.

The apparent thrust of appellant's argument is that the State used its peremptory challenges to strike qualified blacks from the panel. The same argument was advanced in *Ridley v. State,* 475 S.W.2d 769, 772 (Tex.Cr.App.1972), wherein we stated:

> "We hold that no systematic exclusion has been shown. To hold otherwise would in effect be abolishing our peremptory challenge practice which has always been a part of our system to help an accused as well as the State obtain an impartial jury and a fair trial."

We adhere to our holding in *Ridley.* See also *Hill v. State,* 487 S.W.2d 64 (Tex.Cr. App.1972); *Smith v. State,* supra; and *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

No reversible error is shown. The judgment is affirmed.

ROBERTS, Judge, dissenting.

### I.

I remain convinced that the oath required by V.T.C.A., Penal Code, Section 12.31(b), is neither the equivalent of nor an adequate substitute for the requirements of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). See Part I of my dissenting opinion in *Shippy v. State,* 556 S.W.2d 246, 257–264 (Tex.Cr.App.1977). I would accordingly hold that the trial judge improperly excused prospective jurors McLarty and Nixon in violation of *Witherspoon.*[1]

Although McLarty first stated that she could never vote to inflict the death penalty, she later testified that she could truthfully answer the punishment stage questions according to the evidence. She admitted in response to the prosecutor's leading question that the death penalty factor would in some way "affect her deliberations." However, she later clarified her views in her last testimonial statement when she said, "I still think it [the death penalty] would be in the back of my mind that it would result that way."

Prospective juror Nixon was asked by the prosecutor, "Mr. Nixon, how do you yourself feel about the death penalty; do you believe in it?" The following then occurred:

> "A My religious—
> "THE COURT: I can't hear you.

---

1. This error as to McLarty is property preserved for appellate review. After the trial judge made it clear that he was going to excuse McLarty, he told counsel, "Take your exception." Except for a few short preliminary matters, the entire voir dire of McLarty had dealt with her ability to vote in favor of the death penalty. Thus the trial judge not only had notice what appellant's objection would be; he actually anticipated the objection and granted it before it was made. That counsel subsequently made other objections is not destructive of this objection, which was clearly overruled by the trial judge.

The error as to Nixon was also preserved. Appellant reserved a timely exception to the excusing of Nixon. Although counsel made no specific mention of *Witherspoon,* his ground of objection was clear, since the only subject of examination during Nixon's voir dire was his ability and willingness to inflict the death penalty.

"MR. NIXON: My religious—no.

"THE COURT: Against your religion? All right, get your card and go back to the central jury room."

The appellant then objected on *Witherspoon* grounds and the prosecutor continued his examination. Nixon stated that because of his religious beliefs he could never vote for the death penalty "not unless, you know, the only, you know, I believe, you know, what the Bible says." The prosecutor then asked if the mandatory sentence of death or life imprisonment would affect Nixon's deliberations in the case. When Nixon said it would, the State "submitted" the juror and the judge excused him over appellant's exception.

For the reasons stated in my dissent in *Shippy,* I do not believe these jurors were disqualified.[2] The due process requirements of *Witherspoon* were therefore violated, and reversal should result. See *Davis v. Georgia,* 429 U.S. 122 (1976).

## II.

In *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2992, 49 L.Ed.2d 944 (1976), Justice Stewart, speaking for three members of the Court, wrote that "the pen-alty of death is qualitatively different from a sentence of imprisonment, however, long. Death in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two."[3] This statement occupies a position of relative insignificance in the midst of over two hundred pages of death penalty opinions issued by the Supreme Court on July 2, 1976.[4] Nonetheless, I believe that the statement is extremely important to a proper interpretation of death penalty law as it exists today under our federal Constitution.

In its opinions of July 2nd, the Supreme Court re-affirmed what had become, for some,[5] a dubious proposition: that the death penalty is not, in and of itself, cruel and unusual punishment. This has always been my view. See *Tezeno v. State,* supra, 484 S.W.2d at 377; *Jurek v. State,* 522 S.W.2d 934, 950, note 11 (Tex.Cr.App.1975) (Dissenting Opinion of Roberts, J.). This conclusion is supported by the Constitution itself, particularly in the language of the Fifth and Fourteenth Amendments, both of which provide that the state or federal government may not deprive anyone of *life,* liberty, or property without due process.[6] (Emphasis added). Of course, what the

---

**2.** I do believe that prospective jurors Hamilton and Chase were absolutely disqualified under *Witherspoon,* even though the majority prefers to justify their disqualification under the lesser standard of V.T.C.A., Section 12.31(b). Hamilton remained staunch and unequivocal in her acknowledged inability to vote for the death penalty in any case, while Chase repeatedly stated that she "probably" could not vote to inflict the death penalty. This was sufficient. See *Tezeno v. State,* 484 S.W.2d 374, 383–384 (Tex.Cr.App.1972); *White v. State,* 543 S.W.2d 104, 108–109 (Tex.Cr.App.1976).

**3.** See also *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Two other members of the Court apparently agree, albeit much more emphatically, since they both believe that the death penalty is so different from a term of imprisonment as to be unconstitutional. See *Woodson v. North Carolina,* supra, 428 U.S. at 305–306, 96 S.Ct. 2978 (Opinions of Brennan and Marshall, JJ.); *Gregg v. Georgia,* supra, 428 U.S. at 227, 231, 96 S.Ct. 2909 (1976) (Opinions of Brennan and Marshall, JJ.); *Furman v. Georgia,* 408 U.S. 238, 257, 314, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Opinions of Brennan and Marshall, JJ.).

**4.** In addition to *Woodson* and *Gregg,* the cases are *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262 (1976); and *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

**5.** See, e. g., Goldberg, THE DEATH PENALTY AND THE SUPREME COURT, 15 Ariz.L.Rev. 355 (1973); Tao, BEYOND *FURMAN V. GEORGIA*: THE NEED FOR A MORALLY BASED DECISION ON CAPITAL PUNISHMENT, 51 Notre Dame Lawyer 722 (1976); Comment, THE DEATH PENALTY: A CRUEL AND UNUSUAL PUNISHMENT, 27 Sw.L.J. 298 (1973); Note, IS THE DEATH PENALTY DEAD?, 26 Baylor L.Rev. 114 (1974).

**6.** Similarly, Article I, Section 19, of the Texas Constitution provides: "No citizen of this State shall be deprived of *life,* liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." (Emphasis added).

Due Process Clause unquestionably implies is that one *may* be deprived of life, liberty, or property if the taking is in accord with due process. This is a simple enough proposition, yet it is at the heart of any proper understanding of the death penalty.[7]

The Due Process Clause also implies something which is just as important in any consideration of the death penalty: By its choice of language, the Clause states and even emphasizes the relative importance of the three values it seeks to protect. The Clause speaks in terms of life, liberty, and property—*in that order.*

It is an order which has obvious meaning. As Americans, we value life above liberty and liberty above property. It follows that more process is due when one is on trial for his life than when he faces only a deprivation of his liberty, just as more procedural protection is required when an individual's liberty is at stake than is necessary when it is the individual's property which the State seeks to expropriate.

Thus, due process requires that all death penalty juries be selected and guided with greater care than is demanded in other criminal trials. *Witherspoon v. Illinois,* supra; *Gregg v. Georgia,* supra; *Woodson v. North Carolina,* supra. This is in accord with well-established precedents. For example, due process demands that the State be put to a greater burden of proof in a criminal trial—where life or liberty is at stake—than that required in a civil trial where property issues are involved. *In re Winship,* 397 U.S 358, 362–364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *Speiser v. Randall,* 357 U.S. 513, 525–526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). And compare *Duncan v. Louisiana,* 391 U.S. 145, 194, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), with *Alexander v. Virginia,* 413 U.S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973).

In summary, then, I would hold that the procedural safeguards afforded a criminal defendant are necessarily greater in a death penalty case, not only because due process demands it, not only because our society's values affirm the need for it, but also because the finality of the death penalty itself makes it imperative. No matter how innocent or guilty an individual may be, no matter how greatly his rights may have been violated, he can gain no relief from any court if he has already been executed.

This is not to say that every error in a death penalty case is presumed to be harmful; nor is it meant to deny the importance of vigorous prosecution of capital defendants. What is necessary, however, is that this Court—indeed, every court—take special care to assure that a death penalty defendant be treated with the scrupulous fairness that due process requires. We may not do otherwise without violating the Constitution we have sworn to uphold.

### III.

In determining whether a defendant's due process rights have been violated by the conduct of the voir dire examination, we should look to the entire voir dire and not to portions in isolation—except of course where those portions standing alone constitute reversible error, e. g., *Davis v. Georgia,* supra. This is the approach we take, for example, when we review the court's charge or when we review a record to determine whether erroneously admitted evidence—or other error—is harmless.

Thus in *Bailey v. State,* 532 S.W.2d 316, 322 (Tex.Cr.App.1975), we held that "[i]n considering the charge on appeal, we will not review isolated portions, but will consider the charge as a whole." Yet in *Ransonette v. State,* 550 S.W.2d 36, 42–43 (Tex. Cr.App.1977) (Opinion on Appellant's Motion for Rehearing), we held that an instruction on circumstantial evidence is required if circumstantial evidence is relied upon to establish the appellant's guilt as a principal, even though the court's charge

---

7. See *Gregg v. Georgia,* supra, 428 U.S. at 117, 96 S.Ct. 2909; *Woodson v. North Carolina,* supra, 428 U.S. at 305, 96 S.Ct. 2978; *Wither-* *spoon v. Illinois,* supra, 391 U.S. at 522–523, 88 S.Ct. 1770.

includes an instruction on principals. And in *Gavia v. State*, 488 S.W.2d 420 (Tex.Cr. App.1972), a murder prosecution under the 1925 Penal Code, we held that the inclusion in the court's charge of an instruction on the right of self-defense *arising from a reasonable expectation or fear of death or serious bodily injury* did not eliminate the need for an instruction on self-defense *against an unlawful violent attack* as provided for by Article 1224 of the former Code.

We may thus derive an exception to the general rule of *Bailey*. We will review the charge as a whole except where the absence of a given charge is, standing alone, a significant deprivation of the defendant's rights, as guaranteed to him by the Constitution or statutes, or by well-settled case law.

We follow a similar rule when we consider whether the error in the admission of unconstitutionally obtained evidence is harmless. Generally, we review the record of the case as a whole and determine whether the error is harmless beyond a reasonable doubt. *Cole v. State*, 484 S.W.2d 779, 783–784 (Tex.Cr.App.1972), and authorities there cited. However, there are some constitutional rights "so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), quoted with approval and followed in *Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

An examination of the entire voir dire seems especially mandated in any review of a capital case because of *Witherspoon's* requirement that the State not "produce . . . a jury uncommonly willing to condemn a man to die." [Footnote omitted.] 391 U.S. at 521, 88 S.Ct. at 1776.[8] I therefore turn to the voir dire examination to determine whether this death penalty was imposed by a jury "organized to return a verdict of death."[9]

## IV.

### A.

When James L. Godbolt was called as a prospective juror, he testified that he did not believe in the death penalty. Then, in response to the prosecutor's questions, Godbolt stated that this "personal belief" would preclude him from ever voting for the death penalty. Godbolt also affirmed that the mandatory sentence of death or life, taken together with his feelings against the death penalty, would affect his deliberations on the fact issues in this case, especially his deliberations on the three questions asked at the punishment stage of the trial. See V.T.C.A., Penal Code, Section 12.31(b); Art. 37.071, V.A.C.C.P.

However, upon closer examination by defense counsel and the trial judge, Godbolt stated unequivocally that he could set aside his feelings about the death penalty and answer the three punishment questions "honestly [and] based on the evidence . . . even though [appellant] would get the death penalty." In accord with *Witherspoon*, as well as Section 12.31(b), supra, the trial judge declared, "All right, he's qualified on that point."

The prosecutor then asked Godbolt if his business or personal life would suffer if he were forced to be sequestered for several nights the following week with the rest of the jury panel. Godbolt replied that he was a barber, that every day he was away from work was a day he received no pay, and that he was behind on his bills. He also stated that he was one of only two barbers in the shop where he worked, and the other barber had been summoned for jury duty the following Tuesday. Godbolt concluded that if he were to serve on this jury the barber shop would have to be shut down until he or the other barber had completed jury duty. After a brief additional exami-

---

**8.** The *Witherspoon* court also specifically held that "a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death."

[Footnote omitted.] 391 U.S. at 521–522, 88 S.Ct. at 1776.

**9.** See note 8, supra.

nation on the same subject, Godbolt was excused from the jury by the trial judge, who acted without the benefit of a motion by the State or the defense or any agreement between them to excuse the juror. Defense counsel noted his exception in a timely manner.[10]

Thus the trial judge was confronted with a venireman who personally opposed the death penalty but could still qualify as a juror in this case. Since Godbolt was not subject to a challenge for cause, it was error for the court to excuse him.

### B.

The voir dire examination of prospective juror Patricia Brightman represents another instance of the denial of due process demonstrated by the voir dire as a whole. In responding to the prosecutor's questions, Brightman stated that she believed the death penalty should be imposed only in those cases where a man raped a young girl or a baby; otherwise, she was opposed to capital punishment. Upon further examination Brightman qualified her answer by indicating that she might be in favor of capital punishment in some murder cases: "[I]t all depends, you know, on what the case is about."

The State then determined that Brightman could consider the full range of punishment for the lesser included offense of murder. Next, the prosecutor asked Brightman if she could find someone guilty of murder even though the State presented no evidence of motive. Initially, Brightman, responded that she could not do so, then indicated that she would only "prefer" to have such evidence, and finally stated unequivocally to the prosecutor that she would not require evidence of motive before finding someone guilty of capital murder.

The prosecutor then turned to the issue of premeditation, defining it as "kind of a pre-planning or pre-scheming" and explaining that Texas law does not require the State to prove premeditation in a murder case.[11] In response to the prosecutor's questions, Brightman stated that she would require the State to present some evidence of premeditation before she could find a person guilty of murder, even though Texas law did not require it. The State then "submitted" the juror.

The appellant followed the State's lead and also assumed that premeditation is never part of the required proof in a capital murder case.[12] The defense began its questioning of Brightman by pointing out that premeditation is often insusceptible of proof because it exists only in the mind of the assailant. Brightman then acknowledged that she could follow the law and not require the State to prove premeditation despite her personal feelings to the contrary.

---

**10.** This Court has consistently held that it is error for the trial judge to excuse prospective jurors on his own motion; however, this erroneous removal is deemed harmless unless the defendant shows that he was injured. E. g., *Valore v. State*, 545 S.W.2d 477, 481 (Tex.Cr. App.1977). Nonetheless, it should be remembered that this holding is conditioned on the requirement that "neither the Constitution nor the statutes [be] violated." *Rogers v. State*, 163 Tex.Cr.R. 260, 261, 289 S.W.2d 923, 924 (1956). As will be seen, my concern is not with the exclusion of this juror standing alone; it is instead with the part this exclusion played in an overall pattern of jury selection which denied appellant his right to due process of law.

**11.** At this point it should be observed that one form of capital murder does require proof of premeditation, although that word is not specifically mentioned in the statute. Section 19.-

03 of our Penal Code defines capital murder. Subsection (a)(3) of that section sets out one of the methods of committing capital murder: when "the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration." It seems to be beyond dispute that capital murder under this subsection cannot be proved without evidence of premeditation, and that a prosecutor who fails to present such evidence has not met his burden of proof. Thus, the prosecutor's statements on this issue were overbroad and constituted, at least in part, an incorrect statement of the general law of murder, which was the focus of that portion of the voir dire examination.

**12.** See note 11, supra.

The State then resumed its examination of the prospective juror. What follows is the entirety of the remaining voir dire examination of Patricia Brightman:

"Q [By Prosecutor] Now, Miss Brightman, I won't belabor the point, but I had just asked you the same question and you had said that you would require some evidence of premeditation.

"A Yes.

"Q Is that still the way you feel?

"A My personal feeling—

"Q Yes.

"A —yes, that's the way I feel. But going by the law, then I would have to go by the law.

"Q In other words, then, if you were selected on a jury and you knew that the man was charged with capital murder and you know that if he's found guilty of that by you, he's going to get a sentence of death or a sentence of life, you know that.

"A Uh-huh.

"Q All right, my question is: Before you could find him guilty of murder where he's going to get a sentence of death or a sentence of life, would you have to have some evidence of premeditation?

"A Well, my—

"MR. HUDSON [Defense Counsel]: Object to the question, Your Honor. She's answered it.

"THE COURT: Well, since she's answered both ways—.

"A My personal feeling, I would have to, but by the law, I would have to go with everyone else. This is my personal feeling. *I would have to have some evidence, but if I had to go by the law*—

"THE COURT: No, if you've got to have some evidence, that disqualifies you. Get your card.

"MR. HUDSON: Note our exception, Your Honor.

"THE COURT: Take your exception. You've been very kind, Miss Brightman. I'm sorry you had to wait so long.

"MISS BRIGHTMAN: Yes." (Emphasis added.)

The emphasized portion of Brightman's response makes it evident that she was in the process of repeating her assertion that she could "go by the law" and not require the State to provide proof of premeditation. The trial judge then cut the juror off and disqualified her, once again on his own motion.

Thus, for the second time the trial judge was confronted with a prospective juror who had initially expressed strong reservations about inflicting the death penalty in all cases that the law allowed it, but who was nonetheless qualified to serve as a death penalty juror. Again, it was error for the court to excuse a qualified juror whose answers nevertheless made it clear that she would be less inclined than many other prospective jurors to inflict the death penalty on this appellant.

### C.

The examination of Doris Minicks began with a discussion of whether she was acquainted with some of the appellant's relatives; she concluded that she was not and also stated that she did not know Nannie Jones, Linda Fay Marshall, Robert Wayne Trotter, or Larry Bickems, four of the State's listed witnesses in the case. Minicks then testified that, to the best of her knowledge, she had never seen appellant. Next, the prosecutor asked if she knew either of appellant's attorneys, Steve Halsey or Sam Hudson. She replied, "I know Sam Hudson indirectly; somebody pointed him out to me." The voir dire examination then proceeded as follows:

"MR. HALSEY [Defense Counsel] I'm sorry, I missed your answer, you know Sam Hudson how?

"MISS MINICKS: Indirectly; somebody pointed him out to me and his father works for the same department I work for. Other than that, I don't—I don't know him personally; he doesn't know me.

**334**

"MR. HALSEY: I see, okay.

"Q [By Prosecutor] Do you know his father pretty well?

"A Not really. He works in another section in the same department I work in.

"Q Have you ever talked with his father?

"A Yeah.

"Q What type of work do you do?

"A Well, I'm a secretary for Department of Housing and Urban Development, the Regional Council.

"Q And what does Sam's father do?

"A I think he's an EO specialist, equal opportunity specialist.

"Q Well, do you feel like the fact that you know Sam's dad, that that might make—you know, you'd rather sit on some case where you don't know the lawyers on either side? Don't you think that might be a little bit better?

"A Well, it's up to you because I—I don't know him personally; I know—

"Q Well, you're going to see his dad and, of course, we're going to be trying this case and afterwards you're going to go back and work with his dad, you know. And, of course, both sides have got a position in this case and, you know, in all fairness to both sides and that's the only reason I asked that question. You know, there's other juries that you can serve on and other cases where you don't know either party.

"A Okay.

"Q Do you think that might be better that way?

"A Yeah.

"THE COURT: I think so, too, since you know a member of the family.

"MR. HALSEY: Judge, let me just ask her—

"EXAMINATION

"*BY MR. HALSEY:*

"Q Would it put you in an uncomfortable position, I mean I know you don't know Sam Hudson personally, but since you know his dad, would it put you in an uncomfortable position if you found against Sam's client, for example, and had to go back there and work with his dad?

"A No. See, I don't work with him directly. I see him in the hall. He—works in another section and I'm in another section and I just see him, you know, to speak to him; other than that—

"Q Oh, I see. Well, if you think it might affect, you know, your business or, for that matter, listening to the testimony in some way, then that's fine.

"A I don't think—you know, I don't think it would.

"THE COURT: Both of you work for the government?

"MISS MINICKS: Uh-huh.

"THE COURT: Federal government? You all have lunch in the same place?

"MISS MINICKS: No, I've never had lunch with him, no.

"THE COURT: How did you know that was his dad?

"MISS MINICKS: Somebody—let me see. One of the attorneys I work with told me that his son was an attorney and, you know, somebody pointed him out to me.

"THE COURT: You've never had any business dealings with him?

"MISS MINICKS: No, he don't know me at all.

"THE COURT: What's the State's position?

"MR. BURNHAM [Prosecutor]: Well, Judge, we feel like that since she does know Sam's dad it might be better for her to sit on another case and that way neither side would have someone on the jury that they know; we wouldn't want someone on the jury that we know.

"THE COURT: I think that's more or less a fair proposition. Don't you? You look like an awful fair-

minded young lady. I'm going to agree with that because, after all, you'd run into him when this is over with and there you'd be, you know. You're very fair minded. Thank you so much. I'm sorry you had to wait so long to find this out.

"MR. HALSEY: I guess we'll except to that ruling.

"THE COURT: Go about your business. Go back to work for the government.

"MR. TOKOLY [Prosecutor]: I'm a little surprised at Mr. Halsey in light of the fact that we've agreed to excuse people who knew a police officer or had a relative that knew a police officer and this lady has indicated she felt like she knew a relative of the Defendant and she knew Sam Hudson or at least had met his dad.

"THE COURT: Next juror."

The trial judge erred in excusing Minicks over appellant's objection, since she was not subject to a challenge for cause. Art. 35.16, Vernon's Ann.C.C.P. Ordinarily, this error would be deemed harmless. *Valore v. State*, supra; *Rogers v. State*, supra. However, the voir dire examination of Minicks cannot be fairly considered without comparing it to the voir dire of several other prospective jurors and especially to the examination of Mrs. Rayford Bolin.[13]

## D.

First, I observe that the prosecutor sought to justify the trial judge's action in excusing Minicks by stating that the State had agreed to excuse any prospective juror "who knew a police officer or had a relative that knew a police officer." The prosecutor's assertion is not supported by the record. Nineteen of the prospective jurors acknowledged that they, or a relative of theirs, knew one or more police officers.[14] Of these, only two, Claxton and Rings, were excused by the trial judge because of this knowledge—Claxton because he admitted bad feelings toward police officers as a result of his son's juvenile arrest and Rings because he admitted that he "really didn't know" whether his friendship with an Irving police lieutenant would affect his judgment of the police witnesses in the case.

Of the seventeen remaining prospective jurors, ten were struck by appellant, three were struck by the State, and four served as jurors. In contrast with the examination of juror Minicks, the trial judge made no effort to intervene when these prospective jurors acknowledged that they were acquainted with police officers, nor did the State make any offer—spontaneous or otherwise—to excuse any of these seventeen jurors, even though several of them were much more closely acquainted with police officers than Minicks was with counsel's father.[15]

This is not to say that these seventeen prospective jurors should have been excused automatically by the trial judge. However, when taken together with the examination of Minicks, the judge's failure to intervene in this aspect of the voir dire not only

13. See Part III of this opinion, supra.

14. These were jurors Mary Price, Harrell, Martin, Funk, Blackmore, Chamness, Valentine, Claxton, Christian, Rings, Carter, Shanks, Barker, Hunnicutte, Burns, Legg, McFadden, Cecil Price, and Shaw. Of the nineteen, the first ten were examined before Minicks, the remaining nine afterwards.

15. For example, juror Harrell stated that one of his nephews was a police officer in California and another nephew was a court bailiff there. Harrell himself had once been a Treasury Department investigator. He was the subject of appellant's second peremptory challenge.

Juror Blackmore, who was also struck by appellant, stated that he had met two or three Dallas Police Department officers and also knew one reserve deputy, who had been a guest in Blackmore's home. The deputy was a good friend of Blackmore's son.

Juror Shanks stated that a friend of his daughter's was a Dallas Police Department officer. Similarly, prospective juror Barker testified that he had two "friends that I went to high school with that are members of the Dallas Police Department." Juror Burns stated that he knew "a few" Dallas police officers and that one was a "close friend." All three of these prospective jurors were struck by the appellant.

undermines the prosecutor's assertion on this issue, it also accentuates the error in the excusal of Godbolt and Brightman. Unfortunately, the examination of prospective juror Bolin reveals other, similar error.

### E.

The State first determined that Bolin did not know appellant or his attorneys. The prosecutor then asked how Bolin felt about the death penalty. She answered "I believe in the death penalty. I'm for it in certain instances." A few moments later she added that she had believed in the death penalty for a long time.

After asking Bolin several questions about her personal background and ascertaining that she would have no difficulty being part of a sequestered jury, the prosecutor received her assurance that she would base her verdict solely on the evidence. He explained to her the bifurcated nature of the trial as well as the nature and content of the special issues at the punishment stage. Bolin stated that her answers to these issues would be based on the evidence and her deliberations on them would not be affected by the mandatory sentence of death or life imprisonment. She also stated that she could follow the law as explained by the prosecutor and not require evidence of motive or premeditation. She also testified that she could consider the full range of punishment for the lesser included offense of murder. She agreed to follow the law by requiring the State to prove its case beyond a reasonable doubt, by presuming appellant innocent until proved guilty, by considering appellant's indictment as no evidence of his guilt, and by according the appellant his right to remain silent.

Appellant began his examination of Bolin by asking several more questions about her personal background. Bolin then stated that she had read about the case at the time the offense occurred and gave a short summary of what she remembered from her reading; her knowledge of the case was accurate but not extensive. She testified that she could disregard what she had read and base her decision on the evidence alone.

After several additional personal questions, counsel asked Bolin if she knew any prosecutors or police officers; she replied that she did not and also stated that neither she nor her husband had ever belonged to any neighborhood law enforcement organization or the like. She stated that neither she nor any member of her family had ever been charged with a crime, nor had any of them been a victim of a crime.

She acknowledged that she belonged to the same church as Judge John Vance, a criminal district judge in Dallas, but testified they were not well-acquainted. She stated that she had served as a juror in a misdemeanor case, and that the jury had reached a verdict. Defense counsel then re-examined her on several points covered earlier in her testimony.

Defense counsel then showed Bolin a list of the witnesses in the case and asked if she knew anyone on the list. She replied that she knew of Deia Sutton, the deceased's companion when he was killed, because Sutton's father was "a customer of my husband's in the insurance business." Although Bolin stated that she did not know Sutton or her father personally, she testified that she and her husband had discussed Sutton's involvement in this case. It is noteworthy that in testifying about her husband's insurance business with Sutton's father, Bolin referred to the Sutton family as "our customers" even though Bolin did not work in the business.

Bolin stated, however, that she did not think that she would be influenced by this business relationship if she were chosen as a juror. Then, after counsel interrogated Bolin briefly about her husband's views on the death penalty and her own possible racial prejudice, the defense concluded its examination of Bolin and asked that the judge grant its challenge for cause on the basis of "knowledge of the complaining witness in this case testifying, being a customer of her husband." [16] The judge denied this challenge, and the prosecutor told the judge that the State would accept the juror.

---

**16.** The appellant also urged that Bolin was racially prejudiced.

Because appellant had exhausted his peremptory challenges, he asked for an additional such challenge. The judge denied this request, and Bolin was seated as the final juror in the case.

### F.

The majority concludes that it was not an abuse of discretion to overrule this challenge for cause and deny the request for an additional peremptory challenge. But in so holding, the majority fails to look at the trial judge's action in the context of the entire voir dire, especially the examination and excusal of Doris Minicks. By saying that Minicks was disqualified because of her faint awareness of defense counsel's father while at the same time asserting that Bolin was qualified despite her husband's business relationship with the family of one of the victims,[17] we are giving a signal to trial judges that their discretion in the selection of capital juries will not be given a meaningful review by this Court.

This is the opposite of due process; it is in fact no process at all. The record reveals that the trial court allowed the selection of a jury which was not merely neutral but was predisposed to impose the death penalty. This clearly violates the mandate of *Witherspoon* as well as the requirements of our own Texas Constitution.

I would hold that an examination of the entire voir dire reveals a jury selection process in violation of due process and the due course of the law of the land.[18] More specifically, I would hold that the trial court reversibly erred in excusing prospec-

tive jurors Godbolt, Brightman, and Minicks, and in seating juror Bolin.

### V.

Finally, I would point out that reversal in this case is not only required by the Federal Constitution; our Texas Constitution mandates it also. See Article I, Section 19, of the Texas Constitution, quoted in footnote 6, supra. This section was construed in *Paris v. State*, 35 Tex.Cr.R. 82, 31 S.W. 855 (1896). Paris was found guilty of murder and sentenced to die. The case was reversed because of the trial court's failure to allow the defendant sufficient cross-examination of one of the State's witnesses, because of the court's failure to give a limiting charge on impeachment testimony, and also because of its failure to give a proper charge on the issue of duress. The Court concluded its opinion with the following language:

"Whether the jury which tried the case would have attached any weight to the excluded testimony is not for us to say, or whether the charge of the court, if it had properly limited the admitted testimony, in the one case, and had presented the issues to the jury, in the other, would have changed the result, is not our province to inquire; but we do know that, under the law and the decisions of this state, the defendant has been deprived of testimony to which he was entitled, and the charge of the court did not adequately present the issues as to the other evidence which was admitted. *Every citizen, when placed upon trial for his life, is*

17. And see the examination of juror McFarland, summarily excused by the judge because of her acquaintance with the appellant's mother. Compare also the examination of Jackson, excused because her brother knew the appellant somewhat and mentioned the case to her.

18. The record contains numerous other previously undiscussed examples of this erroneous selection process. For examples, see the examination of prospective jurors Dunaway (an anti-death penalty venirewoman who nonetheless could impose it but who stated she could not impose the minimum five-year punishment for the lesser included offense of murder; the appellant's attempts to rehabilitate her on this

issue were prematurely cut off), Sparks (a prospective juror whose support of the death penalty was hesitant but who also qualified on this issue; when he stated he too could not consider the minimum punishment for murder, appellant was again cut off in his attempts at rehabilitation), Lister (prospective juror who did not believe in the death penalty, but could impose it, excused because she was the mother of children *over* ten years old—see Art. 2135, V.A. C.S.), Wolford (anti-death penalty venirewoman; appellant prematurely cut off from *Witherspoon* rehabilitation), Palmo (again, appellant was prematurely cut off from rehabilitating anti-death penalty venirewoman).

**338**

entitled *to a trial according to the due course of the law of the land;* and the rules of evidence in the admission of testimony, and the application of rules of law to admitted testimony, are as much a part of the law of the land as trial by jury itself. *These rules of law may be termed by some technicalities, but they accord with a fair and an impartial trial, and are founded in the wisdom of experience; and, moreover, some of these constitute the safeguards and bulwarks of human rights, and, whenever and wherever they have been disregarded or ignored, that era has marked the decadence of human freedom.*" (Emphasis added). 34 Tex.Cr.R. at 96, 31 S.W. at 858.

As in *Paris*, the judgment should be reversed and the cause remanded.

PHILLIPS, J., joins in this dissent.