Donny CARPENTER, Appellant,

v.

The STATE of Texas, Appellee.

No. 57218.

Court of Criminal Appeals of Texas,
Panel No. 1.

Jan. 30, 1980.

On Rehearing April 16, 1980.

Hulon B. Brown, Jacksonville, on appeal only, for appellant.

K. E. "Pete" Menefee, Dist. Atty., Rusk, Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J., and ROBERTS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

The offense is delivery of LSD April 28, 1975. On an indictment filed January 26, 1976 appellant was tried and convicted by a jury that also assessed punishment—75 years confinement.

In four grounds of error appellant seeks reversal because the trial court admitted evidence of an extraneous offense, excluded testimony from two defense witnesses designed to impeach that of the complaining witness, a DPS undercover agent, and overruled a mistrial for improper jury argument by the district attorney. Since sufficiency of the evidence to support the guilty verdict is not challenged, we review only that which provides a background for considering the grounds of error.

Asserting that he was not acquainted with nor had ever met appellant before the day in question, the undercover agent, Danny Green, testified that he went to a pool hall in Jacksonville and, at invitation of appellant, was soon shooting pool with him, and during the course of that recreational activity appellant asked if Green would be interested in "scoring,"—buying some "purple barrel," slang for LSD. Green's response, now commonly trite in such matters,[1] was that he might be interested "if the price were right." Green then described his observations as appellant left the pool hall to meet "his connections," his return to the pool hall, the arrival of two white males, one of whom delivered to the back pocket of appellant a plastic bag with approximately 500 purple tablets in it, his departure with appellant in Green's automobile and the transaction that ensued—an exchange of 75 tablets of LSD for $150.00—their return to the pool hall and appellant's leaving his presence saying "come back if I needed to score or buy any more tablets from him." With testimony from a chemist that from tests performed on the tablets the substance was LSD, the case for the State was completed.

In his first ground of error appellant contends that the trial court erred in admitting evidence of an extraneous offense occurring April 28, 1975—five days after the instant offense—over his objections. Elements of the issue had been developing in the subsoil of the testimony and colloquies between the court and counsel.[2] But it

---

1. The characterization is not intended as a criticism but, understanding the implications of that response, to indicate our belief that it was, indeed, given.

2. On cross-examination of Agent Green, who had earlier identified one of the white males who came to the pool hall on the afternoon of the occasion in question as Johnny Wolford, the State objected to a line of questions concerning Wolford on the grounds that "*identity has already been made of the defendant, Carpenter, and no objection was raised at the time as to the identity of Wolford.*" (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

Testifying on his own behalf when first asked on direct examination where and when he met

suddenly surfaced immediately after the questions and answers quoted in note 2, supra:

"Q: Did you deliver, about a week later, twenty-five purple barrels to Danny Green?

MR. BROWN: Your Honor, at this time we would like—

THE WITNESS: No. sir.

MR. BROWN: —to ask the Court to instruct the jury not to consider that question for any purpose, as the district attorney has all day objected to any other matters, period. I would like to ask the jury not to consider the question for any purpose.

THE COURT: *Let's limit it to the matter at hand.*"

After a brief exchange, the jury was excused and the court and counsel engaged in a lengthy discussion of the law as it applied to the testimony that had been adduced. Attorney for appellant was permitted to develop fully a bill of exception on his motion for mistrial after which the State requested the court to admonish the jury "not to consider the question by the State regarding a subsequent delivery  .  .  .  a week later; ask the jury not to consider it for any purpose," but urged the court to deny the motion for mistrial. When the jury returned the court sustained the objection and instructed the jury not to consider for any purpose the question propounded and the answer to that question "as that question and that answer is stricken from the record." Again, the State cross-examined concerning other matters and then returned to draw an affirmation that what Agent Green had testified concerning April 23 was a lie and that he never had "any intent whatsoever" on that date to sell LSD. The next question was whether he had "ever sold any kind of drugs"—and again an argument ensued during which the court first suggested that the broad question be limited to the matter of the month in question, phrasing the limitation to be "during the month of April *or* prior to April 23rd." The next question, that drew a negative response, asked about selling any kind of drug, specifying a number of particular ones, "prior to or in the month of April, 1975." To an objection that the jury be instructed not to consider the question for any purpose the State then announced, "I will withdraw the question," and the court instructed the jury not to consider the last question and answer "for any purpose whatsoever." A motion for mistrial was overruled.

After a brief redirect examination appellant rested.

The State promptly recalled Agent Green on rebuttal and went directly to the subsequent extraneous offense but only got so far as, "Officer, let me direct your attention to the 28th day of"—when the court interrupted and, on motion of appellant, instructed the jury not to consider the incompleted question for any purpose. Another

Green, appellant said it was in the Jacksonville pool hall and, as to whether it was April 23, 1975, "It could have been. I am not sure on the dates." Subsequently, and to the apparent discomfort of his lawyer, appellant began to vacillate concerning his presence in the pool hall on April 23, saying, at first, that he "couldn't have been" because he recalled getting a telephone call in Texas City, where he was working, on the day a warrant was issued for him in Jacksonville (there is no other evidence that the warrant was issued on April 23) and somehow related late April developments to his April 30 birth date; then, curiously, as to further questions by his lawyer as to his presence in Jacksonville on that date, the court sustained objections by the State but later permitted him to say that on that date he was in Texas City and not in Jacksonville. Finally, his attention being directed to testimony of Green that on the specified day Green purchased LSD from appellant, appellant answered, "He is lying there."

On cross-examination by the State, appellant gave an affirmative answer to a query that whatever Agent Green testified to as happening on April 23 just did not take place; the prosecutor moved on to other subjects and then returned to appellant's position as to April 23:

"Q: Okay, and you state that you were not there on the 23rd day of April?

A: I said I wasn't sure I wasn't there. I don't know the date. I couldn't keep up with it. That's a long time ago.

Q: But you are saying, in effect, that you did not deliver any LSD to Danny Green?

A: Yes, sir, that's right."

motion for mistrial was overruled and, after the jury was recessed for the day, appellant again made a motion for mistrial based upon every allusion to transactions after April 23 because the court had earlier ruled them out and the State had persisted in efforts to bring them before the jury. That motion was likewise overruled.

The following morning, having the impression that the State would renew its attempts to get the evidence of the extraneous offense before the jury, the appellant made a lengthy motion in the nature of one to suppress that testimony, essentially that it was not admissible for any purpose, particularizing defensively several anticipated purposes. In response the State merely informed the court that it would "rely on the law in the State of Texas and ask the Court to overrule any motion that would preclude the State from offering extraneous offense," and the court overruled the motion to suppress.

Agent Green then testified that at about 5:30 in the afternoon on April 28 he saw appellant at a place he called the "J. & J. Recreation Center," premises that also include the pool hall where they played on the first occasion, April 23. He was approached by appellant and asked if he wanted to buy "some more acid" that he, appellant, knew where he could get some; not unexpectedly, Green conceded his interest "if the price was right." Green then observed appellant walk over to and converse with one Charles Bates.[3] After their conversation, Bates came to Green and offered to sell 20 hits of LSD for the "street price" of $2.00 a tablet and Green responded that he would look at the LSD, and if it looked all right, he would buy it. Bates told Green that he would have to go elsewhere and get the LSD and Bates said he would wait for him there at the pool hall. After Bates left Carpenter and he shot pool for about 25 minutes and when Bates had not returned as promptly as indicated, appellant asked if Green would like to go see what was keeping Bates.

They left the pool hall in Green's car and at appellant's direction drove away from Jacksonville several miles when they saw an oncoming car that appellant identified as being Bates'. Green turned his automobile around, now following Bates, and pulled up beside Bates who said he had the acid. Carpenter, on the passenger side of Green's automobile was, as we understand the situation, nearer Bates than Green. As Green explained, "From car to car he handed Defendant Carpenter a small plastic package which contained the twenty tablets, and said that would be $40.00." Green, however, professed to have only a $100.00 bill and the need to get it changed so he suggested they meet back at the pool hall. Stopping on the way, Green got change for the bill and at the pool hall, when approached by Bates, told him he had the money, gave him two $20.00 bills and Bates said "he appreciated the business and if I needed anything else to come back later." At some point between the transaction on the highway and the return to the pool hall, appellant passed the twenty hits to Green.

On cross-examination by appellant, Green reiterated he knows who Donny Carpenter is and was sure Donny Carpenter knows who he is and, further, that he knew of no question about one being able to identify the other.

On surrebuttal appellant called Charles Bates who testified that during a two week period that included April the 28th he was away in Oklahoma visiting relatives and neither then nor at anytime engaged in the transaction described by Green.

As originally drafted by the court, the proposed charge included instructions on considering the April 28 extraneous offense on the defense of alibi as well as the matter of identity. After appellant dictated his objections and exceptions to the charge of the court, including the paragraph relative to alibi because appellant was not requesting it and, on the contrary, urging that it be deleted and, further, to the paragraph rela-

---

3. Green labeled Bates as "the co-defendant," meaning in the case based on an indictment charging the April 28 offense. Johnny Wol-ford, the record shows, was co-defendant in the April 23 transaction.

tive to identity on the ground that it was not an issue in the case and should, therefore, be deleted, the State also dictated objections, suggesting the extraneous offense be coupled with identity only, but urging that an instruction on the defensive theory of alibi be retained. The court reacted by deleting any reference to the defensive theory of alibi.[4] Whereupon appellant then renewed his objection to the revised charge as it instructed on the matter of identity, urging that the issue had never been questioned or raised during the entire trial and that the only purpose of including it was to protect the State in connection with the extraneous offense that it had developed over his objection, contending that the evidence was solely "to prove that the defendant had committed other offenses and was a dope salesman." Overruling the last set of objections, the court then read a charge to the jury to the effect that it could not consider testimony of any other offense unless the appellant committed it and then only in determining the identity of the appellant in connection with the offense charged in the indictment.

4. The charge does not instruct the jury on the matter of alibi in any respect, thereby removing the issue from the case.

5. Since the immediately preceding questions were expressly and specifically directed to the April 23, 1975 occasion at the pool hall and appellant stated he had only been in the pool hall with Green that one time, we frankly cannot read the word "ever" in that context to be a blanket assertion of "never." Rather, we believe that counsel framed his question to mean "ever" on the occasion of April 23 and that the State so understood it for when thereafter appellant was asked if he had "ever" been in an automobile with Danny Green the State withdrew its objection on an unstated ground by saying, "If we are talking about the 23rd that's fine," and counsel for appellant *then* made it clear that he was asking about being in an automobile on any occasion whatsoever. In any event, the matter is not as clear as the State insists, and the trial court plainly reflected its own view by telling the jury that evidence of the extraneous offense, if it found the offense had been committed, may only be considered in determining identity.

6. As indicated earlier, at trial the State urged the court to admit the testimony on the theory of identity, reading to the court portions of *Lee*

More particularly in his ground of error appellant contends also that the extraneous offense should not have been admitted because it did not have the necessary distinguishing characteristics common to the primary offense. For its part the State, now represented by a successor district attorney, urges a new and different theory for admitting the testimony of the April 28 extraneous offense. That is, when appellant "made a blanket assertion that he never asked Danny Green in the pool hall in Jacksonville to buy some acid that he opened the door for the State to offer in rebuttal evidence that this had in fact taken place."[5] Then, pointing to the defense of alibi and denial that the event occurred, the State relies on *Haggerty v. State*, 490 S.W.2d 858 (Tex.Cr. App.1973), but *Haggerty* is not dispositive because the trial court, in deleting from the charge any instruction relative to alibi, agreed with the contention of appellant that the defense of alibi was not in the case. Further, the State has apparently abandoned its trial contention that the extraneous offense was admissible on the theory of identity for it neither makes the contention nor cites any authority on that point.[6] Giv-

*v. State*, 496 S.W.2d 616 (Tex.Cr.App.1973), citing also *Owens v. State*, 450 S.W.2d 324 (Tex.Cr.App.1970) and *Blankenship v. State*, 448 S.W.2d 476 (Tex.Cr.App.1969). In each of those cases the accused not only denied the transaction but testified to an alibi. In *Blankenship* the defense of alibi and a special defense of being "framed" authorized admission of the extraneous offense; in *Lee* and *Owens*, however, the court believed that alibi testimony necessarily raised the issue of identity. The writer here, however, believes that such a *per se* proposition is neither valid in logic nor in law. For example, one asserting an alibi defense may be simply questioning the veracity of the identifying witness. As to the law, *Lee* cites *Gilmore v. State*, 493 S.W.2d 163 (Tex.Cr. App.1973) and *Gray v. State*, 467 S.W.2d 466 (Tex.Cr.App.1971). *Gilmore*, in turn, cites as its earliest authority *Blankenship*, supra, but does also rely on *Owens*, supra, while *Gray* invokes as its oldest decision on this point *Mendoza v. State*, 459 S.W.2d 439 (Tex.Cr.App. 1970) which, in turn, advises the reader to "see" *Owens*. As we have already pointed out, *Blankenship* went off on alibi and the defense of being "framed," *Owens* stands as the common progenitor of all the others.

*Owens*, 450 S.W.2d at 326, states, "Certainly by offering evidence as to alibi appellant called

en the satisfaction of the State that identification had been made in its case in chief, the equivocal nature of appellant's testimony concerning his whereabouts, the affirmation by Green on rebuttal of the certainty of his identification of appellant, we seriously doubt that identity remained a contested issue. The thrust of appellant's personal position, stated and reiterated several times, was simply that Green had fabricated a transaction on April 23. Nevertheless, we defer to the obvious conclusion of the trial court, leading him to so instruct the jury, that identity was in the case and that issue permitted his admitting the testimony.

Still, though identity be an issue that permits evidence of an extraneous offense, it is settled that error is committed by admitting testimony of an extraneous offense whose characteristics are not distinctively common to the offense on trial. *Ford v. State*, 484 S.W.2d 727, 730 (Tex.Cr.App. 1972); *Cameron v. State*, 530 S.W.2d 841 (Tex.Cr.App.1975) and, most recently reaffirmed, *Pirkle v. State*, 592 S.W.2d 642 (Tex.Cr.App.1979). Thus it must appear that the evidence of the extraneous offense is so relevant to the material issue of identity on the ultimate conclusion of guilt or innocence that the extent to which it may also show a propensity to commit crime is overshadowed.

Since the burden is on the State to demonstrate, as an essential predicate for admitting it, that the extraneous offense is relevant to the issue of identity, the trial court must determine before receiving it (and on appeal where that determination is assailed this Court must decide) whether something about the extraneous offense rationally produces a justifiable inference that serves to identify the accused as the person who committed the offense for which he is being tried. That "something," while not susceptible to inclusive definition by itemization, may be one or more distinctive characteristics, so novel, unique, unusual or peculiar that when also seen in commission of the offense on trial one may reasonably conclude that the same accused committed both. A workable metaphor for the process is to study the mosaic of the extraneous offense and that of the offense on trial for a sense of persuasion that both were done by the same artisan.

While, as here, the trial court is not shown to have made any study of that sort—the State did not develop testimony from Green concerning the extraneous offense before it was presented to the jury— we do know that "identity" considerations persuaded its admission. Our review of the decision to allow the extraneous offense must necessarily be *de novo*, in the sense that we must make an independent examination of the testimony rather than determine whether a stated conclusion by the trial court is supported factually or legally. We must look for that "something" in the

into question Mrs. Davis' identification of him as the man who robbed her, thus authorizing the admission of the extraneous offenses. See *Parks v. State*, Tex.Cr.App., 437 S.W.2d 554." No other authority is cited for the proposition. Turning, then, to *Parks* we find from the discussion in 437 S.W.2d at 556–557, the issue under consideration was solely reliability of identification made by eyewitnesses raised by cross-examination and proof that latent fingerprints at the scene were not those of the accused—the defense of alibi was *not* in the case.

Actually, the first opinions addressing the matter of mixing identity with alibi appear to be *Fields v. State*, 95 Tex.Cr.R. 20, 252 S.W. 759 (Tex.Cr.App.1922) and its companion, *Scott v. State*, 95 Tex.Cr.R. 82, 252 S.W. 756 (Tex.Cr.App.1923). *Fields*, decided first and without citation of authorities, may reasonably be analyzed as holding that the evidence was admissible to rebut the defense of alibi and only incidentally bearing on identity; *Scott* focuses more on the testimony bearing on matters of identity but the four authorities cited to support its affirmative answer to the inquiry, 252 S.W. at 757, deal, respectively, with intent, *Bedford v. State*, 75 Tex.Cr.R. 309, 170 S.W. 727 (Tex.Cr.App.1914); system at issue, *Stovall v. State*, 97 S.W. 92 (Tex.Cr.App.1906); rebuttal of asserted self-defense, *Craig v. State*, 23 S.W. 1108 (Tex.Cr.App.1893); and circumstantial evidence of presence, *Wright v. State*, 56 Tex.Cr.R. 353, 120 S.W. 458, 461 (Tex.Cr.App. 1909).

In sum, rather than a *per se* proposition, my judgment is that whether alibi may be converted into an issue of identity is to be decided on a case by case basis, depending upon the circumstances of the particular situation.

extraneous offense that produces a justifiable inference that appellant is the perpetrator of the April 23 offense and, in so doing, we now compare or contrast each factual element that may have some relation, and comment on its significance, as we see it.[7]

First, on both occasions Green was approached in or about the same recreation center—whether in the pool hall within the center is neither clear nor regarded as decisive—during the afternoon. Being a somewhat notorious place open to the public and frequented by habitues of that particular form of recreation, this event is hardly remarkable.

Second, April 28 appellant asked if Green wanted to buy some more acid.[8] On April 23 the suspect asked Green if he would be interested in "scoring some purple barrel"—a term Green had to explain to the court and counsel was slang for LSD. Since Green himself vouched for this parlance in the usual solicitation to buy LSD, anyone initiated in the drug culture would be expected to be familiar with and use it.

Third, on both occasions Green expressed interest "if the price was right." April 28 the price was stated by *Bates* to be the "street price" of $2.00 a tablet. The April 23 suspect sold 75 tablets for $150.00, the same consideration. But, being the "street price," the identical consideration does not tend to show identity.

Fourth, as to mode of dress of the perpetrator,[9] the record is silent as to April 28, while on April 23 the suspect was wearing

blue jeans and a white T-shirt with blue and red pin stripes—what in a pool hall might well be the uniform of the day. In any event, a common characteristic is not shown.[10]

Fifth, on April 28, after ascertaining that Green might be "interested" appellant walked over to and conversed with Bates, and Bates then approached Green and made the actual proposal as to amount, quoted his price, indicated he "would have to go to his stash" and proposed that Green wait in the pool hall. On April 23 the suspect himself negotiated the transaction, indicated he would have to leave and "meet with his connections" and return to the pool hall. There is here a clear distinction that we regard as significant: On April 28 appellant did not speak for himself nor presume to speak for Bates whereas on April 23 every word spoken to Green was solely by the suspect.

Sixth, on April 28 Bates left the pool hall to go to his stash several miles away and on the way back was seen driving a white over blue Chevrolet—not otherwise described. On April 23 after the suspect returned to the pool hall, Green observed the arrival of a 1962 Chevrolet—not otherwise described—occupied by two white males, one of whom was Wolford.[11] Entering the pool hall, Wolford walked to the suspect and delivered a quantity of tablets to his back pocket. We believe the rather substantial difference in the manner of acquisition of the LSD by the respective sellers exhibits a startling contrast in exercise of discretion

7. In this exercise, veracity is attributed to Green in every particular.

8. Using the word "more" in context suggests no more than that appellant was aware Green had made one or more earlier buys of LSD; it does not necessarily require an inference that appellant was the prior seller.

9. An element specifically mentioned by *Ford v. State*, 484 S.W.2d 727 (Tex.Cr.App.1972); cf. *Henriksen v. State*, 500 S.W.2d 491, 497 (Tex. Cr.App., concurring opinion of Morrison, J., 1973), as a significant mark of both crimes having been committed by the same person.

10. Although not a mode of dress, on April 23 Green noticed that the suspect had a tattoo on his left arm. While the tattoo is not otherwise

described, the appearance of any tattoo being rather unusual, we are at a loss to understand why that peculiar feature is never again mentioned in the record. For instance, appellant, himself, testified from the witness stand for what appears to be an extended period of time, but never was asked to exhibit his left arm by either counsel. See, e. g., *Taylor v. State*, 474 S.W.2d 207, 210, headnote 4 (Tex.Cr.App.1971).

11. At the time Wolford was wearing blue jeans and a white T-shirt and Green volunteered that that was usually what he was wearing whenever he saw Wolford. See n. 9 and accompanying text.

in revealing one's source of a controlled substance.

Seventh, April 28, at the suggestion of appellant, he and Green played pool while they awaited the return of Bates. April 23, when Green, who had also left the pool hall, returned, the suspect was shooting pool by himself and told Green that his connection was on the way; but if they played pool during that interlude, Green was unable to recall it. Engaging in such recreational activity, however, is to be expected of persons waiting in a pool hall for the happening of some other event that was said would occur there. Absent observation of some individualized technique by the player on both occasions we do not attach any significance to this pool playing.[12]

Eighth, delivery of LSD on both occasions took place in Green's automobile all right, but the events leading up to that delivery widely vary.[13] On April 28 it was made by Bates handing the LSD from his automobile over to appellant, a passenger in Green's car who then passed the prescribed 20 tablets on to Green. April 23, however, the suspect, himself, took from the supply on his own person the agreed 75 tablets and handed the baggie containing them to Green. Thus, appellant was more or less a conduit of convenience between Bates and Green by virtue of the circumstances, whereas on April 23 the suspect delivered LSD from his own deliberately contrived possession.

Ninth, on April 28 Bates was content to part with possession of 20 tablets of LSD without payment on delivery. On April 23, though, the suspect exchanged LSD for agreed consideration paid on the spot.

Tenth, and finally, on April 28, after Green obtained change for his $100.00 bill, he handed $40.00 directly to Bates and there is not the slightest suggestion that appellant received so much as a penny or other consideration as a "finder's fee."

April 23, on the other hand, the suspect received directly $150.00 and there is no showing at all that Wolford or anyone else got a cut for his participation in the transaction. As in most instances of commerce in our society, participation in a drug venture is reflected by monetary gain. That appellant, so far as testimony of Green shows, did not receive any benefit, monetary or otherwise, from the April 28 transaction dramatically distinguishes it from the April 23 episode that garnered the suspect, so far as our record shows, every one of the $150.00 paid by Green.

In sum, the only "something" we perceive as common characteristics of the two scenarios is that Green was approached in the same pool hall by another person concerning buying LSD and delivery of different amounts, but at the same price, was made in his automobile in or around Jacksonville. We are persuaded that there is nothing novel, unique, unusual or peculiar in these common characteristics for, in explaining how he "made" several other delivery cases in the Jacksonville area, Green insisted that he presented himself "at places where there are drugs being used and sold (and) if people want to come up and sell me dope, I'm there to buy," denying that he ever initiated the transaction by an offer to buy. We see nothing out of the ordinary in delivering a controlled substance in the privacy of an automobile at the going price. Indeed, from the records of delivery cases that come to this Court, we would be greatly surprised if such a transaction occurred in some open and obvious setting where the exchange of substance for consideration would be easily observed.

In short, testimony of Green as to the April 28 encounter with appellant did not sufficiently raise a justifiable inference that served to identify him as the person who committed the April 23 offense. Admission of that testimony was, therefore, erroneous and, in the circumstances of this case, held to be harmful and prejudicial.

---

12. As Green himself pointed out when asked if he were near a pool table when Wolford put the plastic bag in the back pocket of the suspect, "That's what it is, is a pool hall. I'm sure I was near a pool table."

13. Mode of commission of both crimes is a characteristic addressed in *Cameron* and *Ford*, supra.

Accordingly, ground of error one must be sustained and the cause reversed. We pretermit ruling on the other grounds of error for, in the event of a new trial, they are not likely to recur. The argument complained of related to the extraneous offense that we have held inadmissible on the issue of identity and in the two instances of proposed impeachment of Green, if the matter of his smoking marihuana on other occasions is not collateral,[14] denial of the attempt is probably harmless.

Judgment of conviction is reversed and the cause remanded.

ONION, P. J., dissents.

Before the Court En Banc.

## OPINION ON STATE'S MOTION FOR REHEARING

ODOM, Judge.

This is an appeal from a conviction for delivery of LSD, wherein punishment was assessed at seventy-five years. On original submission we held the judgment must be reversed because evidence of an extraneous offense was improperly admitted. After careful examination of the record, we are convinced the extraneous offense was admissible.

Appellant was charged with having delivered LSD on April 23, 1975. Testifying in his own behalf, appellant denied committing the offense charged. The undercover narcotics officer, Danny Green, testified on rebuttal for the State that appellant also delivered LSD to him on April 28, 1975. Both transactions took place at or near a pool hall in Jacksonville. On original sub-

mission the Court agreed with appellant's contention that, although he had put identity into issue, the evidence of the extraneous offense should not have been admitted due to the insufficient similarity of the extraneous offense with the offense charged.

■ Our reading of the record reveals another, independent ground for admission of the complained of evidence. On direct examination the following testimony was elicited from appellant:

"Q. Did you ever ask Danny Green at the pool hall in Jacksonville to buy some acid or score or something of that nature?

"A. No, sir."

In *Hamilton v. State*, 480 S.W.2d 685, this Court stated the rule applicable to the situation presented in the instant case:

"On direct examination, appellant made the blanket claim that he had 'never been inside a burglary before, I didn't know nothing about how to rob or nothing.' On cross-examination he reiterated this statement whereupon the prosecutor questioned him concerning other robberies in which he was identified as a participant. *The extraneous offense became admissible in rebuttal to appellant's blanket claim that he had never been involved in a robbery before. Davis v. State*, Tex. Cr.App., 478 S.W.2d 958 (1972); *Kemp v. State*, 157 Tex.Cr.R. 158, 247 S.W.2d 398; *Alexander v. State*, Tex.Cr.App., 476 S.W.2d 10 (1972)."

In the case at bar the testimony quoted above constituted a blanket claim that appellant had never asked Green to buy any LSD at the pool hall in Jacksonville,[1] thus

---

14. See *Bates v. State*, 587 S.W.2d 121 (Tex.Cr. App.1979, opinion on appellant's motion for rehearing).

1. The relevant testimony which preceded appellant's denial of ever having asked Green at the pool hall to buy LSD was as follows:

"Q. Now, you heard his testimony that on the 23rd of April, 1975, you were there and that this was delivered to him by you in a car, did you not?

[Objections]

By Mr. Brown [defense counsel]:

"Q. On the 23rd day of April, 1975, the testimony was that you and Danny Green were playing pool. Have you ever played pool with Danny Green?

"A. No, sir.

"Q. Have you been in the pool hall with him?

"A. Yes, sir.

"Q. And on how many occasions have you been in the pool hall when he was there?

"A. One.

"Q. One?

authorizing evidence of an extraneous delivery of LSD at that pool hall in rebuttal. This ground of error is overruled.

■ In two of the three remaining grounds of error, appellant complains of the trial court's exclusion of testimony of two witnesses as to whether Green had smoked marihuana behind the Caliente Club in Jacksonville. Suffice it to say that Green's denial of having smoked marihuana at the Caliente Club was made by a bill of exception, but was not made in the presence of the jury until *after* the excluded testimony had been offered. Thus, there was no testimony to be impeached when the trial court's ruling was made. Appellant did not reurge his offer when Green denied the incident in the jury's presence. Exclusion of the testimony was proper at the time it was offered. These grounds of error are overruled.

■ In the remaining ground of error appellant contends the trial court erred in failing to grant his motion for mistrial based on alleged improper argument by the prosecutor. Appellant objected to the following remarks:

"In the event you find the defendant not guilty, I guess we will keep on trying. But our next case, that extraneous offense case, is just like this case."

The objection was sustained and the jury was instructed to disregard these remarks. Later, the prosecutor stated:

"Our next case, the extraneous offense case, the testimony in that case—"

The prosecutor did not complete this statement. The trial court ruled that argument of the extraneous offense would be allowed to the extent permitted under the charge.

Under the circumstances, the instruction to disregard was sufficient to cure the er-

"A. Yes, sir.
"Q. Was that the occasion where you left and went riding with the girl?

"A. Yes, sir.
  *     *     *     *     *     *
"Q. Did you ever ask Danny Green at the pool hall in Jacksonville to buy some acid or score or something of that nature?
"A. No, sir."

ror, if any, in the former remarks. *Chambers v. State*, Tex.Cr.App., 568 S.W.2d 313; *Blansett v. State*, Tex.Cr.App., 556 S.W.2d 322. Nor can it be said that the latter remark carried a significant potential for prejudice, if in fact it was improper. This ground of error is overruled.

The State's motion for rehearing is granted and the judgment is affirmed.

ROBERTS, J., dissents.

CLINTON, J., dissents to overruling ground one for the reasons stated in original opinion.

Before this testimony was given, appellant stated he had met Green at the pool hall on only one occasion in the month of April, at which time he, Green, and Carol Beck went riding. He specifically denied being present in Jacksonville on April 23. The plain meaning of "ever" in the question "Did you ever ask Danny Green . . . ." was *on any occasion.*